UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

LUBOS NAPRSTEK,

                Plaintiff,

                No. 21-cv-08560(CM)

      -against-

MARRIOTT INTERNATIONAL,
et al.,

                Defendants.

————————————————————————x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 1/10/24

## DECISION AND ORDER GRANTING DEFENDANT UNION'S MOTION FOR JUDGMENT ON THE PLEADINGS

McMahon, J.

Plaintiff Lubos Naprstek ("Plaintiff")[1] has brought this action under the New York State Human Rights Law, New York City Human Rights Law, 42 U.S.C. § 1981, and 29 U.S.C. § 185, the Labor Management Relations Act ("LMRA"), against his employer, Defendant Marriott Hotel Services, Inc.[2] ("Marriott") d/b/a JW Marriott Essex House New York and Hotel ("Essex House"), and under the LMRA against his union, the Hotel and Gaming Trades Council, AFL-CIO[3]

---

[1] When Plaintiff filed his complaint on October 18, 2021, he was represented by counsel. Dkt. No. 1. Counsel withdrew on December 6, 2022, and Plaintiff has proceeded *pro se* since that date. Dkt. No. 41.

[2] Marriott was incorrectly identified by Plaintiff as "Marriott International, Inc." in his Complaint. Marriott informed the Court of the error in a letter dated February 8, 2022. Dkt. No. 16.

[3] The Union was incorrectly identified by Plaintiff as the "Restaurant and Club Employees and Bartenders Union Local #6 AFL CIO" in his Complaint. The Union informed the Court of the error in a letter dated September 12, 2023. Dkt. No. 61.

("Union" or "Defendant"). The lawsuit is brought principally under Section 301 of the LMRA, which allows district courts to hear suits for violations of contracts between an employer and a labor organization representing employees. LMRA § 301(a), 29 U.S.C. § 185(a). Plaintiff alleges a so-called "hybrid" violation of LMRA § 301. Specifically, he alleges that Marriott breached its collective bargaining agreement with the Union by unilaterally imposing certain rule changes at the Essex House, and then that the Union breached its duty of fair representation of its members by: (1) failing to contest or otherwise challenge arbitral rulings on the rule changes; (2) fraudulently claiming it would challenge or had already challenged the arbitral rulings; and (3) concealing its decision not to challenge the arbitral rulings until late April 2021. Plaintiff also alleges that Marriott violated his civil rights, but that aspect of the case is not pertinent to the present motion.

The Union has filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), arguing that Plaintiff's complaint ("Complaint") does not state a claim upon which relief can be granted. *See* Dkt. No. 52.

That motion is granted.

## BACKGROUND

### I.    Parties

Plaintiff Lubos Naprstek lives in New Jersey and has been an employed as an "A-list Banquet Server" at the Essex House since September 1991. Compl. ¶¶ 6, 11. Plaintiff has stated that he has been a dues-paying member of the Union since 1991. *Id.* ¶ 12.

Defendant Union, based in New York, is responsible for a New York City-wide collective bargaining agreement (the "Collective Bargaining Agreement") that has been in effect since 1992. *Id.* ¶¶ 12–15. According to Plaintiff, the Collective Bargaining Agreement includes the following: rules on banquet waiter assignments, pay, and leave; a priority work schedule for A-list Banquet Servers; and no minimum hour requirement for A-list Banquet Servers. *Id.* ¶¶ 13–14. Plaintiff also alleges that these rules "could not be changed unilaterally or without the agreement and/or the written imprimatur of the union membership." *Id.* ¶ 13. The Collective Bargaining Agreement applies to all banquet servers at New York City luxury hotels ("Banquet Servers"), including the Essex House Banquet Servers. *Id.* ¶¶ 8, 15. There are three categories of Banquet Servers at the Essex House: A-List Banquet Servers, who are full-time regular employees; B-List Banquet Servers, who work part-time; and roll call or C-List Banquet Servers. Ex. D to Answer, at 1.

Defendant Marriott, headquartered in Bethesda, Maryland, acquired the Essex House in or around September 2012. Compl. ¶ 16.

## II.   Factual Allegations

### a.   Marriott's Rule Changes at the Essex House

According to Plaintiff, after its acquisition of the Essex House, Marriott hired new staff and either bought out (with severance packages) or fired several older restaurant employees. Compl. ¶¶ 16–17. Plaintiff claims that Marriott tried to do the same with the Essex House's special banquet staff, but was met with resistance. *Id.* ¶¶ 18–19. Plaintiff states that buying out the Essex House banquet staff was prohibitively expensive, because most of the banquet staff earned $170,000 or more per year. *Id.* ¶ 19.

3

Plaintiff claims that Marriott then began to unilaterally institute sweeping changes to the banquet staff rules, including the rules related to assignments, pay, and leave. *Id.* ¶ 20. Marriott's rule changes included "a new 80% work and attendance policy which required all employees to work 80% of available work time." An employee's "failure to so work would be a terminable offense and/or result in forfeiture and credit hours counted towards pension benefits." *Id.* ¶ 21. Additionally, Marriott gave the Essex House employees a narrow window within which to request time off. *Id.* ¶ 23.

Plaintiff claims that Marriott instituted these rule changes "as a means of ridding itself of older, and more experienced banquet staff." *Id.* ¶ 24. Plaintiff believes that the rule changes adversely impacted older workers (including himself), because, without adequate time off, older workers were less physically able to work the same amount of hours as their younger counterparts. *Id.* ¶¶ 22–25. He thus asserts that this was done in order to get older banquet staff to resign.

Plaintiff alleges that these rule changes more than doubled the number of "A-list" Banquet Servers, which diluted the expected and guaranteed work assignment scheduling, changed work distribution, and resulted in less pay for older and long-term Banquet Servers – all in violation of the Collective Bargaining Agreement. *Id.* ¶¶ 32–35. Plaintiff also claims that, although Marriott had increased banquet service fees, since at least 2014, it has refused to share these extra proceeds with the banquet wait staff and has not increased banquet wait staff gratuities as required under the then-current version of the Collective Bargaining Agreement.[4] *Id.* ¶¶ 36–37. Plaintiff asserts

---

[4] The Court is working off the only version of the Collective Bargaining Agreement with which it was provided – the version that came into effect on July 1, 2012. Ex. A to Answer; Dkt. No. 12. The Agreement was due to expire by its terms on June 30, 2019; however, its renewal clause provides that: "The Agreement shall be renewed from year to year thereafter unless written notice of termination by certified mail, return receipt requested is given by either party to the other not less than sixty (60) days prior to its expiration." As no party has alleged that the agreement was terminated in accordance with this provision, the Court assumes that the agreement has automatically renewed each year and that it was the agreement in force in September 2019, when the arbitration at the heart of this lawsuit took place.

that Marriott's rule changes were in contravention of the prior rules and understandings under the prevailing Collective Bargaining Agreement, and that they resulted in the improper withholding of more than $500,000 in compensation from Plaintiff and similarly situated banquet wait staff. *Id.* ¶¶ 33, 35–36, 38. According to Plaintiff, this compensation is subject to a contractually imposed 15% penalty, and damages continue to accrue. *Id.* ¶ 38.

### b. The 2019 Emergency Hearing and Arbitration Awards

Plaintiff alleges that the Union made little or no effort to contest Marriott's rule changes. *Id.* ¶ 26.

Clauses 26(A) and 26(K) of the July 2012 Collective Bargaining Agreement provide in relevant part:

> All complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement or any acts, conduct or relations between the parties, directly or indirectly, which shalt not have been adjusted by and between the parties Involved shall be referred to a permanent umpire(s) to be known as the Impartial Chairperson, and his/her decision shall be *final* and *binding* upon the parties hereto. Any questions regarding arbitrability, substantive, procedural, or otherwise, or regarding the impartial Chairperson's jurisdiction or authority, shall be submitted to the Impartial Chairperson In accordance with this Article. . . . The decision rendered by the Impartial Chairperson shall have the effect of a judgment entered upon an award made, as provided by the Arbitration Laws of the State of New York, entitling the entry of a judgment in a court of competent jurisdiction against the defaulting party who falls to carry out or abide by such decision.

Collective Bargaining Agreement, Clause 26(A), 26(K) (emphasis added). Pursuant to the Collective Bargaining Agreement, at the request of the Union and the Essex House, on September 13, 2019, the Office of the Impartial Chairperson of the Hotel Industry (the "OICHI") held an emergency hearing between the Essex House and the Union to arbitrate several topics related to

Marriott's rule changes. Answer ¶¶ 20–22; *see generally* Ex. B, C, and D to Answer. Following the emergency hearing, the OICHI issued its three final and binding rulings and awards (the "November 2019 Ruling").

One hearing topic requested by the Essex House was on the Essex House's right to mandate that A-List Banquet Servers use their vacation over a reasonable time or else have it paid out. Ex. B to Answer, at 1. Prior to Marriott's rule changes, it was the practice at the Essex House to allow Banquet Servers to carry over their vacation time and pay. *Id.* The OICHI Chairperson found in favor of the Essex House in light of the contractual language in the Collective Bargaining Agreement and permitted the Essex House to end the past practice and pay out vacation pay at the beginning of each fiscal year for the preceding year. *Id.* at 1, 3. However, the Chairperson added that "equity compel[led] [him] to temper [his] ruling" and instructed the Essex House to "pay one-half of each A-list Banquet Server's vacation balance out, before December 31, 2019, and the remaining balance before December 31, 2020." *Id.* at 3.

Another topic raised by the Union before the arbitrator was the Essex House's Management's unilateral increase of the banquet service charge. Ex. C to Answer, at 1. The Union claimed that the Essex House could not create a new banquet service charge without a concomitant adjustment in the gratuity that is given to banquet employees. *Id.* The OICHI found that the Essex House was allowed to increase its service charge, but required the hotel to retroactively allocate a portion of that increase towards the tipped banquet staff. *Id.* at 4. The OICHI chose not to award the Union the penalty it sought against the Essex House. *Id.*

Finally, the Essex House also arbitrated its rights to add two new employees to the A-List and to implement a policy that limits Banquet Servers to passing on no more than 20% of their assignments. Ex. D to Answer, at 1. The Essex House took issue with how two A-List Banquet

Servers worked very few functions and contended that it had a right to have twenty regular full-time A-List Banquet Servers. *Id.* at 2. The Essex House also expressed its general concerns with individuals who constantly passed up work opportunities and sought to establish attendance policy standards. *Id.* The Union claimed that the Essex House raised these issues as retaliation for the Union members' exercise of their rights, including their refusal to settle the service charge dispute. *Id.* at 2–3. The OICHI allowed the Essex House to "red-circle" the two A-List Banquet Servers (which allowed the Essex House to keep them on the A-List until they decided to stop working), promote two servers from the B-List to the A-List, and implement an 80% attendance rule for Banquet Servers. *Id.* at 2, 6. The OICHI found no support for the claim that the Essex House engaged in retaliatory or discriminatory conduct. *Id.* at 6.

In short, the employer prevailed on some issues and the Union on others. Nonetheless, Plaintiff alleges in purely conclusory fashion that the November 2019 Ruling was "the product of fraud and collusion." *Id.* ¶ 27.

### c.  The Union's Failure and/or Refusal to Challenge the November 2019 Ruling

The Union did not take any appeal from these rulings.  Answer ¶¶ 30, 34-39; *see generally*, Ex. B, C, and D to Answer. Plaintiff claims that the Union decided not to challenge or appeal the November 2019 Ruling without informing the Banquet Servers. *Id.* ¶ 29. Plaintiff also claims that the Union concealed their failure to take this appeal from Plaintiff and other employees until late April 2021.  *Id.* ¶¶ 26, 74.

Per Plaintiff, the pertinent allegations are these: in late 2019, Efstratiou Stamatis, a Union delegate (i.e., a representative of the rank and file to the Union[5]) – and a person whom Plaintiff believed had outsized power within the Union – allegedly falsely represented to Plaintiff and other Union members that he and the Union were coordinating efforts to challenge the November 2019 Ruling. *Id.* ¶¶ 28, 31. Plaintiff believes that Stamatis was aware of the adverse ruling and the Union's failure and/or refusal to contest or appeal the November 2019 Ruling, but did not share this information with the Banquet Servers. *Id.* ¶ 30. Plaintiff states that this conduct was consistent with Stamatis' pattern of behavior of concealing facts from and manipulation of other banquet wait staff. *Id.* ¶ 31.

Plaintiff asserts that he did not discover that the Union decided not to challenge or appeal the November 2019 Ruling until April 2021. *Id.* ¶ 29.

### III.    Procedural History

On October 18, 2021, Plaintiff commenced the instant action against Marriott and his Union. His sole claim against the Union is for breach of the duty of fair representation ("DFR") in violation of Section 301 of the LMRA. Dkt. No. 1. Plaintiff alleges that the Union breached its duty of fair representation when it: did not appeal, challenge, or contest the November 2019 arbitration ruling. Plaintiff also alleges that the Union fraudulently claimed that it would do so or had already done so – although he does not plead what the Union said or when the Union said it

---

[5] *See Union Representation*, NY/NJ Hotel & Gaming Workers Union, https://hotelworkers.org/union-workers/union-representation.

with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Finally, Plaintiff contends that the Union concealed that it had not taken an appeal. *Id.*

The Union filed its answer on January 10, 2022. Dkt. No. 12. The Union generally denied the allegations of the Complaint, urged that it failed to state a claim against the Union, and raised a number of affirmative defenses, including: lack of subject matter jurisdiction; and relief is barred by the statute of limitations, the doctrine of arbitration and award, and exhaustion.

On August 8, 2023, the Union filed a motion for judgment on the pleadings, on the ground that the Complaint fails to state a claim on which relief may be granted, pursuant to Federal Rule of Civil Procedure 12(c). Dkt. Nos. 52–53.

## DISCUSSION

### I.    Standard for a Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides: "After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). When ruling on a 12(c) motion, a court is tasked with assessing whether the contents of the pleadings are sufficient to render judgment on the merits. *See* Fed. R. Civ. P. 7(a), 12(c).

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that [for granting] a Rule 12(b)(6) motion for failure to state a claim." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Patel v. Contemporary Classics*, 259 F.3d 123, 126 (2d Cir. 2001)). A court is to consider "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case," *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)). The court must presume all

9

well-pleaded facts to be true, and draw all reasonable inferences in favor of the plaintiff. *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009).

To survive a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The complaint "does not need detailed factual allegations," but must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action;" *Twombly*, 550 U.S. at 555, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice." *Gebhardt v. Allspect, Inc.*, 96 F.Supp.2d 331, 333 (S.D.N.Y. 2000). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680.

In this case the Plaintiff is at present proceeding *pro se*. Courts have an obligation to liberally construe a *pro se* litigant's submissions and interpret them to raise the strongest arguments they suggest. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006); *Zoulas v. New York City Department of Education*, No. 1:18-cv-2718, 2021 WL 3932055, at *8 (S.D.N.Y. Sept. 1, 2021) (citations omitted). The rationale for this rule "is that a *pro se* litigant generally lacks both legal training and experience and, accordingly, is likely to forfeit important rights through inadvertence if he is not afforded some degree of protection." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010).

However, Plaintiff was represented by counsel who drafted his complaint and filed the lawsuit on his behalf. Dkt. No. 1. Though Plaintiff's first counsel died, Dkt. No. 34, and replacement counsel subsequently withdrew from the representation, Dkt. No. 40, that does not mean that the less stringent standard for *pro se* pleadings applies to an evaluation of Plaintiff's complaint, which was drafted by a lawyer. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

Plaintiff's opposition papers on the motion were prepared after replacement counsel withdrew, so ostensibly they were prepared *pro se*. Dkt. No. 41. And in part they clearly were. "When a plaintiff is proceeding *pro se*, the Court also may rely on any opposition papers in assessing the legal sufficiency of the plaintiff's claims." *Rosado v. Herard*, No. 12-CV-8943, 2013 WL 6170631, at *2 (S.D.N.Y. Nov. 25, 2013).

However, it appears to this court – which has considerable familiarity with such matters – that portions of the opposition papers submitted on Plaintiff's behalf were prepared by someone with legal training. While the opposition papers contain arguments that plainly are the product of Plaintiff – principally because no competent lawyer would make them (see *infra*, pp. 13–16) – other parts of his opposition papers (Dkt. No. 57) do not appear to be written by the *pro se* Plaintiff. They do not "sound" like the portions of the opposition papers that are obviously *pro se* and they contain citations to instructive legal authorities in proper BlueBook format. *See Knox v. County of Ulster*, No. 1:11-cv-0112, 2013 WL 286282, at *1 n.1 (N.D.N.Y. Jan. 14, 2013); *see, e.g.*, the first paragraph of "The Motion For Directed Verdict Must Be Denied With Prejudice" section, the majority of the "Plaintiff Is Entitled To Further Discovery And The End Date Is Still Months Away" section. Dkt. No. 57.

The Court notes that "it is not appropriate to afford *pro se* litigants special solicitude where a licensed attorney assisted in drafting their briefs, motions or other court documents." *Askins v.*

*Metro. Transit Auth.*, No. 19-cv-4927 (GHW), 2020 WL 1082423, at *3 (S.D.N.Y. Mar. 5, 2020) (collecting cases). To afford Plaintiff "the special solicitude generally afforded *pro se* litigants in this case would allow him the benefit of legal counsel while also subjecting him to a less stringent standard reserved for those litigants who are truly unrepresented." *Askins*, 2020 WL 1082423, at *4.

Ordinarily I would bring the Plaintiff into court, swear him and question him under oath about whether he had the assistance of a lawyer in preparing his opposition papers. However, because the DFR claims asserted against the Union (as well as the LMRA claim against Marriott) are entirely lacking in factual or legal basis, they must be dismissed with prejudice regardless of who prepared the answering papers. There is no point in prolonging the adjudication of this issue. Plaintiff is warned, however, that if he attempts to pass off "hybrid" papers as his own again (and there is no doubt in the Court's mind that portions of the response to the Union's motion were prepared by an attorney), the Court will put him under oath (under penalty of perjury) and strike entirely papers any portion of which was prepared by a lawyer who is not appearing as counsel in this case.

## II.   The Motion for Judgment on the Pleadings Is Granted

The Union moves for judgment on the pleadings on the basis that Plaintiff does not allege facts showing that the Union engaged in arbitrary, discriminatory, or bad faith conduct, and therefore, fails to state a plausible claim for breach of its duty of fair representation.

### A.   The Union's Motion is Not Premature

Plaintiff argues that the Union's motion for judgment on the pleadings is premature, and criticizes it as having been "filed purely for harassment purposes, in bad faith, to attempt to take

advantage of [his] *pro se* status" as well as in "a bad faith effort to avoid responding to discovery requests properly." He suggests that Union filed its motion before pleadings closed and asserts that "there are still numerous issues that need to be resolved" through months of discovery.

I reject this argument.

The pleadings in this case are closed. Rule 7(a) of the Federal Rules of Civil Procedure lists the allowed pleadings: a complaint, an answer, an answer to a counterclaim, an answer to a crossclaim, a third-party complaint, an answer to a third-party complaint, and, if the Court orders one, a reply to an answer. Here, there are no counterclaims, crossclaims, and third-party complaints; Plaintiff has filed his complaint, Dkt. No. 1; Defendants Union and Marriott have filed their answers, Dkt. Nos. 12, 22; and the Court has not ordered a reply.

The fact that discovery is ongoing is irrelevant, because a motion under Rule 12(c) may be filed before discovery is complete, *Lively v. WAFRA Investment Advisory Group, Inc.*, 6 F.4th 293, 301 (2d Cir. 2021). "*Twombly* is meant to allow the parties and the court to avoid the expense of discovery and other pretrial motion practice when the complaint states no plausible claim on which relief can be granted." *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 325 (2d Cir. 2011).

The Union's motion, therefore, is timely.


### B. Plaintiff May Not Raise Unpleaded Allegations in Opposition to the Motion

Plaintiff raises, for the first time in his opposition papers, a substantial number of new allegations and legal theories, albeit in confusing fashion. Read charitably, it appears that Plaintiff contends that the Union and/or Marriott engaged in modern-day slavery, committed sex crimes (apparently by spying on employees using some sort of camera), violated Title VII, stole gratuities,

violated ERISA and engaged in bribery. Plaintiff asserts, in conclusory fashion, that the Union "should be in compliance with Federal, State Laws and International Human Rights Laws, but they are not." Plaintiff also suggests that counsel representing the Union in this lawsuit is conflicted because the same firm (Pitta LLP) represented the Union – including specifically Plaintiff as a member thereof -- in the arbitration that led to the November 2019 Ruling. Additionally, Plaintiff states that he is "being harassed, shamed, slandered, even accused of perjury and forgery and threatened to quit [sic] because of this lawsuit."

The Union characterizes Plaintiff's new allegations as "supplementary allegations that do not appear in the Complaint and suggest conduct that is not attributable to the Union, let alone conduct that even remotely falls within a union's duty of fair representation." The Union asserts that "these vague accusations have nothing to do with Plaintiff's singular cause of action against the Union and thus have nothing to do with this Motion." The Union is correct and I will pay these new assertions no mind; they have nothing to do with this lawsuit.

"Plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to a motion to dismiss," *J.E. v. Chappaqua Central School Dist.*, No. 14 Civ. 3294, 2015 WL 4934535, at *6 (S.D.N.Y. Aug. 17, 2015); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998). "[H]ence such new allegations and claims should not be considered in resolving the motion." *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99 CV 10452, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) (citation omitted). This is true despite the liberal standard applicable to *pro se* pleadings discussed above. *See supra* pp. 10–11.

While ordinarily a Court's "evaluation of a *pro se* litigant's submissions is complicated by [an attorney's] ghostwriting," *Mejía v. Robinson*, No. 1:16-cv-9706, 2018 WL 3821625, at *3 (S.D.N.Y. Aug. 10, 2018), there is nothing complicated about evaluating these new allegations,

14

which could not possibly have been written by an attorney of any competence. And even affording the Plaintiff special *pro se* deference and considering the statements in his opposition papers as though they had been pleaded, his newly-asserted "facts" fail to come close to stating any claim against the Union. *Pro se* Plaintiffs are bound by *Twombly*'s strictures just as represented parties are. *Thomas v. Calero*, 824 F.Supp.2d 488, 497 (S.D.N.Y. 2011) (collecting cases). Plaintiff's brief alleges no facts tending to show that the Union engaged in sex crimes or modern-day slavery, or that the Union stole tips paid by the Essex House customers. The Union is not Plaintiff's employer, so it cannot be sued under Title VII. Nothing in the Complaint addresses any claim against any health and welfare benefits fund that is or may be governed by ERISA and any such defalcation could only be committed by the employer, not by the Union. And the conclusory allegation of bribery, without more, does not even begin to satisfy the *Twombly-Iqbal* standard.

Not only are these new allegations unrelated to Plaintiff's DFR claim, but it is manifest that "the conclusory facts raised for the first time in the opposition are nothing more than speculation." *Id.* at *4. "Courts have no obligation to entertain pure speculation and conjecture." *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011). That is true even where the plaintiff is acting *pro se.*

Moreover, these allegations would fail to state a claim even if they were not so patently deficient. The only claim a Union member can raise against its Union under the LMRA is a claim for breach of the duty of fair representation, which is not implicated by any of Plaintiff's wild assertions. There is not a single fact alleged tending to show that the Union was aware of any of the novel defalcations asserted by Plaintiff, or that it had any obligation to deal with any of these matters but failed to do so. None of these new allegations impacts the duty of fair representation. Nor do any of these new contentions suggest any violation of the

"bill of rights" for union members under Title I of the Labor Management Disclosure and Reporting Act, 29 U.S.C. § 401 et seq.. – even assuming that the Plaintiff had invoked any exhaustion procedures required by that statute or its CBA.  Ergo, they state no claim against the union.

Therefore, in deciding the instant motion, the Court ignores the new "factual allegations" and theories that are not pleaded in the Complaint and that are wholly unrelated to any DFR claim that Plaintiff has asserted or could assert. *See Tomlins v. Village of Wappinger Falls Zoning Bd. of Appeals*, 812 F.Supp.2d 357, 363 n.9 (S.D.N.Y. 2011); *Feldman v. Sanders Legal Group*, 914 F.Supp.2d 595, 600 n.5 (S.D.N.Y. 2012). I note, however, that had I considered those matters, it would not have changed the decision on this motion. *Feldman*, 914 F.Supp.2d at 600 n.5.


### C.  Plaintiff's Claim DFR Claim Against the Union Fails to State a Claim

"The duty of fair representation applies to all union activity, and in all instances in which a union is acting in its representative role." *Agosto v. Correctional Officers Benev. Ass'n.*, 107 F.Supp.2d 294, 303 (S.D.N.Y. 2000) (internal quotations and citations omitted). "The duty of fair representation requires a union to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Id.* at 303 (internal quotations and citations omitted).

To state a hybrid § 301/ DFR claim, a plaintiff must allege "both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation vis-a-vis the union members." *White v. White Rose Food*, 237 F.3d 174, 178 (2d Cir. 2001) (citing *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164–65 (1983)). The

plaintiff may sue the union or the employer, or both, but must allege violations on the part of both regardless of which entities he chooses to sue. *White*, 237 F.3d at 179.

A plaintiff's "obligation to plead sufficient conduct to support an unfair representation claim has been characterized as an 'enormous burden.'" *Dennis v. Local 804*, No. 07 Civ. 9754, 2009 WL 1473484, at *5 (S.D.N.Y. May 27, 2009). The plaintiff must show that his union's actions or inactions were either arbitrary, discriminatory, or in bad faith, *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010), and those actions (or inactions) have a "causal connection" to his injuries. *White*, 237 F.3d at 178 (citing *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1988)).

A union's actions are "arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (citations omitted). "This 'wide range or reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45–46 (1998).

"A union's actions are discriminatory if they are 'invidious' or 'unlawful.'" *DeFrancesco v. Bottalico*, No. 10 Civ. 8193, 2011 WL 6382610, at *6 (S.D.N.Y. Dec. 16, 2011); *see O'Neill*, 499 U.S. at 81. "Discrimination is invidious if it is based upon impermissible or immutable classifications such as race or other constitutionally protected categories, or arises from prejudice or animus. By contrast, classifications according to seniority and skill level or other employment-related criteria of union members are relevant, rational, and often inevitable." *Cooper v. TWA Airlines, LLC*, 274 F.Supp.2d 231, 243 (E.D.N.Y. 2003) (internal citations omitted); *see Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 203 (1944).

A "union acts in bad faith when it acts with an improper intent, purpose, or motive." *Spellacy*, 156 F.3d at 126 (citations omitted). Bad faith acts include "fraud, dishonesty, and other intentionally misleading conduct," *id.*, and in such cases, "substantial evidence of fraud, deceitful action or dishonest conduct is required to show a breach of the duty of fair representation." *Ryan v. New York Newspaper Printing Pressmen's Union No. 2*, 590 F.2d 451, 455 (2d Cir. 1979) (cleaned up).

Once a plaintiff has established that his union acted arbitrarily, discriminatorily, or in bad faith, he must "demonstrate a causal connection between the union's wrongful conduct and [his] injuries." *Vaughn*, 604 F.3d at 709 (internal quotation marks omitted); *see Fleischer*, 2021 WL 5365581, at *2. When the conduct involves an arbitration proceeding, the plaintiff must show that the union's conduct "seriously undermine[d] the arbitral process." *Barr v. United Parcel Service, Inc.*, 868 F.2d 36, 43 (2d Cir. 1989) (internal quotation marks and alteration omitted); *see Fleischer*, 2021 WL 5365581, at *2. The plaintiff must show more than a possible change in the outcome of the arbitration; he must show that the unsuccessful result was due to his union's wrongful conduct. *Morris v. United Parcel Service*, No. 98CIV7353KMWRLE, 2001 WL 705852, at *5 (S.D.N.Y. June 13, 2001); *Mullen v. Bevona*, No. 95 CIV. 5838, 1999 WL 974023, at *6. In *Morris*, 2001 WL 705852, at *5, the plaintiff failed to meet this requirement since he could not show that the outcome of the arbitration proceeding would have been different had his union followed his proposed plan of action. The plaintiff argued that the union should have filed a lawsuit for wrongful termination instead of taking his case to arbitration; however, since New York does not recognize a cause of action for wrongful termination, the union did not even have the option to follow his proposed plan of action. *Id.*

"Any substantive examination of a union's performance . . . must be highly deferential," *O'Neill*, 499 U.S. at 78, since a union has "broad discretion in its decision whether and how to pursue an employee's grievance against an employer." *Chauffeurs Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 567–68 (1990) (citing *Vaca*, 386 U.S. at 185, 87 S.Ct. 903). A union does not breach its duty of fair representation when it fails to process a meritless grievance, fails to process a grievance due to error in evaluating its merits, *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1153–54 (2d Cir. 1994), engages in mere negligent conduct or errors in judgment, *Barr*, 868 F.2d at 43–44, makes tactical errors, *id.* at 43, or decides not to arbitrate a grievance. *Vaca v. Sipes*, 386 U.S. 171, 191–92 (1967). Although "a union may not arbitrarily ignore a meritorious grievance or process it a perfunctory fashion, union members do not have an absolute right to have their grievances taken to arbitration." *Spellacy*, 156 F.3d at 128 (internal quotation marks and alterations omitted). "The same logic applies, with even greater force, to an arbitration appeal." *Fleischer v. Barnard College*, No. 19-cv-10738, 2020 WL 7360251, at *6 (S.D.N.Y. Dec. 15, 2020).

Plaintiff has claimed that the Union breached its duty of fair representation in the following ways: (1) the Union did not appeal, challenge, or contest the November 2019 Ruling, Compl. ¶ 73; (2) the Union fraudulently claimed that it had done so or would do so, *id.*; and (3) the Union concealed its decision not to do so until April 2021. *Id.* ¶ 74. In connection with the alleged breaches of the duty of fair representation, Plaintiff claims that the Union engaged in fraud and misrepresentation in violation of the LMRA. *Id.* However, apart from Plaintiff's general claim that the Union filed its motion for judgment on the pleadings in bad faith, Plaintiff has not specifically alleged that the Union's conduct was arbitrary, discriminatory, or in bad faith. *See Goodman v. Port of Authority of New York and New Jersey*, No. 10 Civ. 8352, 2011 WL 3423800, at *7

(S.D.N.Y. Aug. 4, 2011); *Jenkins v. St. Luke's-Roosevelt Hosp. Center*, No. 09 Civ. 12, 2009 WL 3682458, at *10 (S.D.N.Y. Oct. 29, 2009).

Even under the standard applicable to *pro se* plaintiffs, this Plaintiff has failed to allege plausibly that the Union breached its duty of fair representation.

### 1. The Union's Failure to Appeal the November 2019 Ruling

Plaintiff contends that the Union breached its duty of fair representation when it "failed to contest or otherwise challenge and/or appeal" the November 2019 Ruling. Compl. ¶ 73. But the Union was under no obligation to do so. *Hinson v. Depository Trust Co.*, Nos. 96 Civ. 2008, 96 Civ. 2024, 1997 WL 16052, at *3 (S.D.N.Y. Jan. 16, 1997). "The weight of authority within the Second Circuit holds that a union's duty of fair representation simply does not include a duty to appeal an unfavorable arbitration decision." *Nieves v. District Council 37 (DC 37), AFSCME, AFL-CIO*, No. 04 Civ. 8181, 2009 WL 4281454, at *10 (S.D.N.Y. Nov. 24, 2009) (collecting cases).

Moreover, "courts have consistently held that a presumption of finality must be accorded to arbitration decisions which are made pursuant to collective bargaining agreements providing for 'final and binding grievance arbitration.'" *Ciano v. Utility Workers Union of America*, No. 94 Civ. 3423, 1995 WL 489452, at *7 (S.D.N.Y. Aug. 15, 1995); *see Jelenic v. Campbell Plastics*, 159 F.3d 1347 (2d Cir. 1998). Here, the Collective Bargaining Agreement provides that rulings by the OICHI Chairperson "shall be *final* and *binding* upon the parties." Collective Bargaining Agreement, Clause 26(A) (emphasis added). "Having submitted the dispute to arbitration before an independent decisionmaker, the union was entitled, if not required, to abide by the award."

*Crusco v. Fisher & Bro., Inc.*, 458 F.Supp. 413, 422 (S.D.N.Y. 1978). In other words, there was no appeal from the decision, so the Union could not possibly have breached its duty of fair representation by failing to take one.

Additionally, even assuming a union's duty to take good-faith appeals, Plaintiff has not pled any facts that support an inference that the Union's failure to appeal the November 2019 Ruling was arbitrary, discriminatory, or in bad faith. Plaintiff has certainly not pleaded any facts that suggest that the Union's conduct was so far outside the wide range of reasonableness as to be irrational. *See O'Neill*, 499 U.S. at 67. Despite Plaintiff's claim that the Union "made little or no effort to contest [the] new rules," Compl. ¶¶ 26–27, the Union appeared at the arbitration, presented arguments before the OICHI, called witnesses, and challenged Marriott's position on the rule changes. One cannot infer that the Union made "little or no effort" to contest the rules merely from the fact that its efforts were partially unsuccessful (and the fact that the arbitrator made several pro-Union rulings in his award can hardly be ignored).

In his opposition papers, Plaintiff mentions that the Union should have called a specific witness who was not called. But a decision not to call a specific witness is not a breach of the duty of fair representation. If the failure to call a witness were in fact erroneous, it would qualify only as an "error in judgment" or a "tactical error." *Barr*, 868 F.2d at 43–44. Neither is actionable as a DFR breach.

Plaintiff also has detailed his displeasure with the arbitration's outcome in his opposition papers. He vociferously criticizes the various rule changes (e.g., "the 80% deadly policy" regarding attendance, the scheduling) that the arbitrator upheld after the hearing. Plaintiff also complains about the Union's inaction after the November 2019 Ruling was handed down, asserting specifically that, "The hotel and the union forgot the basic human needs and rights which are

eating, drinking, sleeping and resting. If any of these basic needs are violated it would have deadly consequences."

But Plaintiff's "apparent dissatisfaction with the outcome of [his] representation does not make that representation irrational." *DeFrancesco*, 2011 WL 6382610, at *5. "So long as the union's action 'is based on a reasoned decision,' it will not be found arbitrary." *Bacchus v. New York City Dep't of Educ.*, 137 F. Supp. 3d 214, 250 (E.D.N.Y. 2015) (quoting *Caputo v. Nat'l Ass'n of Letter Carriers*, 730 F. Supp. 1221, 1226 (E.D.N.Y. 1990)). Plaintiff has not alleged a single fact tending to show that the Union reached its decision not to appeal a "final and binding" arbitration award without rational basis, *see DeFrancesco*, 2011 WL 6382610, at *5.

By contrast, the Union's arguments to the contrary – centered on the "*final* and *binding*" nature of the award, as provided in the CBA – accord with recent cases in this district, which emphasize that unions and employers are encouraged to accept, rather than challenge, the finality of OICHI rulings. *See, e.g., RHC Operating LLC v. N.Y. Hotel & Motel Trades Council, AFL-CIO*, No. 21-CV-10349 (JGK), 2022 WL 1810305 (S.D.N.Y. June 2, 2022); *42nd & 10th Hotel, LLC v. NY. Hotel & Motel Trades Council, AFL-CIO*, 595 F. Supp. 3d 4 (S.D.N.Y. 2022); *NY. Hotel & Motel Trades Council, AFL-CIO v. Stanford New York*, No. 21 CIV 2012 (PAE), 2021 WL 1851998, at *6 (S.D.N.Y. May 10, 2021). While "in hindsight, any decision a union makes in the informal yet complex process of handling its members' grievances may appear to the losing employee to have been erroneous," *Barr*, 868 F.2d at 43, the Union's decision not to appeal the November 2019 Ruling was well within its broad discretion. *See Chauffeurs Teamsters & Helpers, Local No. 391*, 494 U.S. at 567–68 (citing *Vaca*, 386 U.S. at 185); *Barr*, 868 F.2d at 43.

Plaintiff also has not pleaded any facts tending to show that the Union's decision not to appeal the November 2019 Ruling was somehow discriminatory. In his opposition brief, Plaintiff

states that the Union "intentionally didn't challenge the aggravated discrimination that's spelled out in the November 2019 80% attendance policy where two union members are clearly treated differently and are grandfathered to the old policy where they don't face termination by defaulting on it."

But "a showing that a union's action has disadvantaged a group of members, without more, does not establish a breach of the duty of fair representation," because a union, by necessity, must differentiate among its members in a variety of contexts. *Haerum v. Air Line Pilots Ass'n*, 892 F.2d 216, 221–22 (2d Cir.1989) (citing *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)). "The mere existence such differences does not make them invalid." *Humphrey v. Moore*, 375 U.S. 335, 349 (1964).

In connection with Plaintiff's claim that the Union "intentionally didn't challenge the aggravated discrimination," Plaintiff "fails to take the next step of plausibly alleging facts in support of [his] claim that this difference in treatment was the result of invidious or unlawful discrimination." *DeFrancesco*, 2011 WL 6382610, at *6. While Plaintiff is correct that the November 2019 Ruling allowed the Essex House to "red-circle" and treat two of the other A-List Banquet Servers differently from him, Ex. D to Answer, at 2, 6, Plaintiff has not alleged a single fact remotely suggesting that the difference in treatment was based upon some constitutionally protected category, such as race, national origin, religion, gender, or age. Additionally, the arbitrator's ruling allowing this practice is not an action that can be attributed to the Union.

As the Union explains in its submission, "Marriott suggested that those two Servers had special circumstances that distinguished them from other Servers, and should be 'red-circled,' to which the Arbitrator agreed." *Id.* To the extent that Plaintiff implies that he also should have been "red-circled," Plaintiff alleges no facts in support of this.

Finally, Plaintiff appears to argue that the Union's bad faith failure to appeal from the November 2019 Ruling indicates that the ruling was "the product of fraud and collusion." Compl. ¶ 27. He expands on this allegation in his opposition papers, claiming that: "the union together with the hotel likely proposed the outcome of the arbitration award which was robo-signed by the arbitrator;" "the arbitrator signed it and did not even review it for possible omissions (which is tantamount to fraud);" and "members of the executive Marriott managements together with the union agents colluded together and went on mission to terminate the union members via the fraudulent arbitration in November 2019."

Missing from Plaintiff's conclusory allegations of collusion and fraud is a scintilla of factual support – let alone the substantial factual support required to successfully plead a claim of fraud, deceitful action, or dishonest conduct. *Ryan*, 590 F.2d at 455; *see Goodman*, 2011 WL 3423800, at *6. Merely asserting that a ruling is "the product of fraud," or that an act by the arbitrator (not the Union) was "tantamount to fraud" does not make it so. "Conclusory allegations . . . masquerading as factual conclusions will not suffice," *Gebhardt*, 96 F.Supp.2d at 333, and do not support an inference of bad faith. They do not even satisfy the standard for pleading fraud with specificity. Fed. R. Civ. P. 9(b) .

Plaintiff's bare and conclusory allegation that the Union manifested bad faith by somehow colluding with Marriott fails for similar reasons. *Bejjani v. Manhattan Sheraton Corp.*, No. 12 Civ. 6618, 2013 WL 3237845, at *15 (S.D.N.Y. June 27, 2013). Courts in this district "have emphasized the importance of pleading sufficient subsidiary facts when alleging the existence of a conspiracy." *Id.* (citing *Peoples v. Fischer*, No. 11 Civ. 2694, 2011 WL 6034374, at *3 (S.D.N.Y. Dec. 1, 2011); *Sudler v. City of New York*, No. 08 Civ. 11389, 2009 WL 2365335, at *3 (S.D.N.Y. July 31, 2009); *Dunlop v. City of New York*, No. 06 Civ. 0433, 2008 WL 1970002, at *4 (S.D.N.Y.

May 6, 2008)). Plaintiff was required "to substantiate accusations of conspiracy with at least a few factual brushstrokes that bespeak plausibility." *Bejjani*, 2013 WL 3237845, at *13.

But the only fact referenced in Plaintiff in support of his allegation of collusion is that the arbitrator signed an award with which Plaintiff disagrees. Rather than provide factual support, Plaintiff, as the Union argues in its reply brief, simply reiterates his opinions and conspiracy theories. Plaintiff has not alleged the "familiar acts of a conspiracy, such as who was involved, and when and where these individuals met and conspired." *Id.* at *14. Plaintiff's collusion-based account of bad faith "does not rise above *Twombly*'s plausibility threshold. *Twombly* requires more than a charge that something bad happened and a conclusory allegation that this bad thing was also illegal because it resulted from a malevolent conspiracy." *Id.* at *14–15.

### 2. The Union's Alleged False Representation

Plaintiff seems to allege that the Union acted in bad faith, thereby breaching its duty of fair representation, by fraudulently claiming that it would challenge and/or appeal – or had already challenged and/or appealed – the November 2019 Ruling. Compl. ¶ 73.

But Plaintiff alleges no fact tending to show that the Union ever claimed that it would take an appeal from the award. Instead, he asserts that Stamatis – an Essex House employee and long-time Union delegate with a purported history of manipulating other Banquet Servers – "falsely represented to Plaintiff and other members in late 2019, that he and the local were coordinating efforts to challenge the and/or to otherwise challenge the adverse November 2019 arbitration ruling upholding all of the aforementioned unilateral rule changes." *Id.* ¶¶ 28, 31.

I will assume this allegation to be true for purposes of the motion. It fails to state a claim against the Union.

"Courts have found a breach of the federal duty of fair representation *when a union leader has* . . . *misrepresented matters in his dealings with members.*" *Cunningham v. Local 30, Int'l Union of Operating Engineers*, 234 F.Supp.2d 383, 399 n.3 (S.D.N.Y. 2002) (Emphasis added), (citing *Lewis v. Tuscan Dairy Farms, Inc.*, 25 F.3d 1138, 1142 (2d Cir. 1994); *Alicea v. Suffield Poultry, Inc.*, 902 F.2d 125, 130 (1st Cir. 1990)). But Stamatis is not a union leader. He is a Union delegate elected by the members of his bargaining unit. Compl. ¶¶ 28, 30;  Answer ¶ 28. He has interacted  with the Union on behalf of his fellow employees for many years,[6] but a rank-and-file bargaining unit member who serves as a delegate to the Union is not a "union leader" for these purposes, and his actions are not attributable to the Union. *See Union Representation*, NY/NJ Hotel & Gaming Workers Union, https://hotelworkers.org/union-workers/union-representation. He is, rather, a representative of the membership.

Therefore, even if, as the Union admits in its Answer, Stamatis was told about the November 2019 Ruling and the Union's decision not to appeal, Answer ¶ 30,  his failure to disclose this fact to his co-workers (assuming that to be true) is not an act of concealment that can be attributed to the Union. Nothing in the Complaint contradicts the Union's allegation in its Answer that it did exactly what a Union is supposed to do – told the bargaining unit's representative that it was not taking an appeal from an adverse decision. Any failure by Stamatis to communicate that message accurately to his membership could only give rise to a claim of some sort against him – not against the Union.

Moreover, in order to state a claim for misrepresentation by the Union, Plaintiff was also required to sufficiently plead that the misrepresentation attributed to the Union somehow

---

[6] At the emergency arbitration hearing, Stamatis testified that he had been a Union delegate for some twenty-three years. *See* Ex. B to Answer, at 2; Ex. D to Answer, at 5.

undermined the arbitral process. *See Barr*, 868 F.2d at 43. But even drawing all inferences in Plaintiff's favor, there is no basis to suggest that Stamatis' misrepresentation "seriously undermined the arbitral process" and so altered the outcome of the arbitral proceedings. *Barr*, 868 F.2d at 43; *see Crowell Intern. Broth. of Teamsters, Local 202*, No. 00 Civ. 3480, 2001 WL 1230531, *3 (S.D.N.Y. Oct. 16, 2001); *Henry v. United Parcel Service, Inc.*, 602 F.Supp.2d 419, 424 (E.D.N.Y. 2009) (citing *Morris*, 2001 WL 705852, at *2). Presumably, Plaintiff means to allege (though he does not allege) that he would have pushed the Union to take a (fruitless) appeal from the final and binding arbitral ruling if only Stamatis had told him that the Union was not going to do that. But Plaintiff suffered no injury from not being able to make his pitch, because the decision whether to appeal was ultimately – and entirely – within the Union's discretion. *See Chauffeurs Teamsters & Helpers, Local No. 391*, 494 U.S. at 567–68. A union member cannot "compel arbitration of his grievance regardless of its merit," *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567 (1976) (citation and quotation marks omitted), and "the duty of fair representation generally does not obligate the union to appeal or file a petition to vacate an adverse award." *Cowell*, 2001 WL 1230531, at *4 (collecting cases).

### 3. The Union's Alleged Concealment

Finally, Plaintiff argues that the Union violated its duty of fair representation by concealing its decision not to challenge or appeal the November 2019 Ruling until April 2021. Compl. ¶¶ 74–75. Again, his only factual support for this claim comes from his allegations related to Stamatis. *Id.* ¶¶ 30–31. Plaintiff pleads that Stamatis, a union delegate with "a history of concealing facts to other banquet wait staff," "was contemporaneously aware of the Union's failure and/or refusal to contest or to otherwise appeal the adverse arbitration award but failed to so inform the banquet wait staff membership." *Id.*

Plaintiff's own pleading demonstrates why this aspect of his DFR claim must be dismissed. In his complaint, Plaintiff affirmatively alleges that his union delegate was made aware of the Union's decision NOT to appeal the adverse award. He points to nothing in the Collective Bargaining Agreement that requires the Union to communicate such matters to  each and every member of the Union individually. Indeed, from the pleading, it seems clear that Plaintiff expected Stamatis to tell him of the Union's decision. But this simply takes us back to the fact that Stamatis is not a representative of the Union – he is a representative of the membership – so what he does or does not do is not attributable to the Union.

Therefore, this is not a case like those in which "courts have found a breach of the federal duty of fair representation when a *union leader* has purposefully concealed . . . matters in his dealings with members." *Cunningham*, 234 F. Supp. 2d at 399 n.3 (citing *Lewis*, 25 F.3d at 1142; *Alicea*, 902 F.2d at 130) (emphasis added).

Moreover, as a matter of law, "the failure to keep a grievant informed of the status of the grievance is not a breach of the duty of fair representation." *Lettis v. U.S. Postal Service*, 39 F.Supp.2d 181, 197 (E.D.N.Y. 1998) (citing *Caputo*, 730 F.Supp. at 1230). It follows that a union does not have an affirmative duty to notify its members that it would not appeal an arbitration ruling – especially when that ruling is final and binding. *See Ciano*, 1995 WL 489452, at \*7. "To require . . . that the Union had an affirmative duty to notify plaintiff that it would not appeal the Award would 'undermine the presumption of finality,' since such a requirement would imply that appeal of an award is the rule rather than the exception." *Id.* (citing *Freeman v. Local Union No. 135, Chauffeurs*, 746 F.2d 1316, 1322 (7th Cir. 1984)).

### D.  Dismissal of LMRA Claim Against Marriott

"As the claims against the employer and the union are inextricably interdependent in a hybrid cause of action, a plaintiff's ability to sue their [sic] employer is contingent on the threshold showing that the union breached its duty of fair representation." *Fleischer*, 2020 WL 7360251, at *4.

As discussed above, the Union's alleged breaches, "either viewed independently or collectively, are insufficient to state a claim of unfair representation, " *Lettis*, 39 F.Supp.2d at 202, and Plaintiff's DFR claim as against the Union must be dismissed.

Consequently, since Plaintiff is unable to make the threshold showing that the Union breached its duty of fair representation, Plaintiff's LMRA claim against Marriott for its alleged breach of the Collective Bargaining Agreement must also be dismissed. *See Flanigan v. Truck Drivers Local No. 671*, 942 F.2d 824, 828–29 (2d Cir. 1991); *see also DelCostello*, 462 U.S. at 164–65.

### E.  Discovery Complaints

Plaintiff, citing to Rules 26(b)(1) and 37(a) of the Federal Rules of Civil Procedure, and Local Rule 37.3, argues in his opposition papers that he is entitled to further discovery and raises multiple complaints about the Union's approach to the discovery process. He criticizes the Union for its "largely unresponsive" and "late, after they filed their motion" responses, claiming that "this was obviously done in bad faith to attempt to deny [him his] chance to collect all discovery [he is] entitled to." He states that he reserves his right to ask for a motion to compel the Union to respond, and asks that the instant motion be denied with prejudice so that discovery can proceed.

The Union dismisses Plaintiff's discovery claims as irrelevant to its motion for judgment on the pleadings and argues that Plaintiff is incorrect for a variety of reasons. The Union asserts

that not only were its responses timely, but the responses also were responsive to the extent that those interrogatories were about information within the Union's knowledge and relevant to Plaintiff's allegations against the Union. The Union notes that Plaintiff's interrogatories "grossly exceeded the limit of 25, numbering 40 on their face and rising when including subparts as required in the count." Finally, the Union asserts that Plaintiff "provides no factual nor legal hint as to how discovery might provide him with a basis to plausibly undermine the Union's decisions not to challenge or appeal the finality of the Awards."

The Union is correct that further discovery would have had no bearing on the outcome of a motion for judgment on the pleadings. That is end of the matter as far as this motion is concerned.

Moreover, as Plaintiff well knows, Magistrate Judge Cave has been superintending discovery in this case. This court's individual rules instruct the parties to "take all discovery disputes directly to the Magistrate Judge." And indeed, the parties have done so in the past: on November 28, 2023, Plaintiff filed a motion to compel. Dkt. No. 63. In a letter dated November 29, 2023, addressed to Magistrate Judge Cave, Marriott and the Union argued that this motion was premature, in light of the conference scheduled for December 15, 2023 to evaluate the propriety of the parties' discovery requests and objections. Dkt. No. 64. On November 30, 2023, Magistrate Judge Cave denied Plaintiff's motion to compel without prejudice as premature and for failure to comply with the Court's Individual Practices, which require the moving party to request a discovery conference prior to filing a motion to compel. Dkt. No. 65. This court will not get involved in discovery disputes except if a party takes an appeal from a ruling of Judge Cave.

**F. Leave to Amend**

Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Although Plaintiff has not asked the Court for leave to amend his complaint, "the Court may grant leave to amend *sua sponte.*" *In re Garrett Motion Inc. Sec. Litig.*, No. 20 Civ. 7992 (JPC), 2022 WL 976269, at *18 (S.D.N.Y. Mar. 31, 2022) (citation and internal quotation marks omitted) (collecting cases). In this case, leave to amend must be denied because amendment would be futile; Plaintiff cannot possibly state any DFR claim against the Union for failing to take an appeal from the adverse arbitration award or on the basis of Stamatis' alleged concealment of that decision.

## CONCLUSION

For the reasons set forth above, the Union's motion for judgment on the pleadings is granted and Plaintiff's ninth cause of action as against both defendants is dismissed with prejudice and without leave to amend.

The Clerk of the Court is respectfully directed to close the motion pending at Dkt. No. 52.

This constitutes the decision and order of the Court. It is a written opinion.

Dated: January 10, 2024

_____
U.S.D.J.

BY ECF TO ALL COUNSEL