UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/2/2026

LUBOS NAPRSTEK,

                        Plaintiff,

          -against-

MARRIOTT INTERNATIONAL, et al.

                      Defendants.

No. 21-cv-8560 (CM)

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

McMahon, J:

Plaintiff Lubos Naprstek ("Plaintiff") brought this action under the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), 42 U.S.C. § 1981, and 29 U.S.C. § 185, the Labor Management Relations Act ("LMRA"), against his employer, Marriott Hotel Services, Inc. ("Marriott"), d/b/a/ Marriott Essex House New York and Hotel, and his Union, the Hotel and Gaming Trades Council, AFL-CIO ("Union"). Plaintiff's LMRA claim – the only claim brought against the Union – was dismissed on January 10, 2024. *See* Dkt. No. 73.

Presently before the Court are Plaintiff's and Marriott's cross-motions for summary judgment on Plaintiff's remaining claims. As explained below, Plaintiff's claims are nothing more than a thinly veiled attempt to relitigate two labor arbitration awards that were litigated by

the Union, the results of which he disagrees with. Because there are no grounds to vacate either arbitration award, and because Plaintiff adduces no evidence to support the discrimination and retaliation claims that are pleaded on the face of his Complaint, Marriott's motion for summary judgment is GRANTED, and Plaintiff's cross-motion for summary judgment is DENIED.

## Background

### 1. Plaintiff's Rule 56.1 Statement

I first address Marriott's request that the Court deem admitted each set fact set forth in its Rule 56.1 Statement and disregard Plaintiff's own Rule 56.1 statement, due to Plaintiff's failure to comply with Local Rule 56.1. *See* Dkt. No. 139 at 6-7.

Local Civil Rule 56.1 ("Local Rule 56.1") requires a party moving for summary judgment to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1(a). The opposing party is then required to submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Rule 56.1(b). Those facts which are not responded to by a correspondingly numbered paragraph are deemed admitted. *See* Local Rule 56.1(c).

Additionally, facts submitted by either party – including those by the opposing party purporting to controvert a moving party's assertion – "must be followed by citation to evidence which would be admissible." Local Rule 56.1(d). If they are not, those asserted facts risk being disregarded. *See Cooper v. Gottlieb*, 2000 U.S. Dist. LEXIS 12936, at *12–13 (S.D.N.Y. Sept. 8,

2000); *Plahutnik v. Daikin Am., Inc.*, 912 F.Supp.2d 96, 101 n.10 (S.D.N.Y. 2012); *Baity v. Kralik*, 51 F.Supp.3d 414, 419 (S.D.N.Y. 2014).

Plaintiff – who, while represented at the outset of this lawsuit, is presently proceeding *pro se* – has submitted a "Rule 56.1 statement" that fails to comply with Local Rule 56.1 in several respects. *See* Dkt. No. 134 at 36-55.

First, Plaintiff's Rule 56.1 Statement is essentially a recitation of his case-in-chief, rather than a series of short statements of undisputed facts. Much of Plaintiff's "Rule 56.1 Statement" consists of legal arguments and conclusory statements rather than plain statements of fact. The Court will ignore all of that. *See Tatintsian v. Vorotyntsev*, 2024 WL 3675606, at *6. (S.D.N.Y. Aug. 6, 2024).

Second, Plaintiff's Rule 56.1 Statement is replete with "factual" assertions that are not supported by citations to record evidence. Indeed, many of Plaintiff's "statements of fact" are directly contradicted by his own deposition testimony, which means that they do not give rise to any "genuine" issue of material fact requiring a trial. *See Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) ("factual issues that a party creates by filing an affidavit crafted to oppose a summary judgment motion that contradicts that party's prior testimony are not 'genuine' issues for trial."). To the extent Plaintiff does buttress any of his statements of fact with record evidence, it turns out that the evidence he cites – rather like a hallucinated citation generated by AI – often fails to support his assertions of fact, *see Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). In other instances, the evidence cited is neither relevant nor material to the claims at issue, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

3

The counterstatement to Marriott's Rule 56.1 Statement filed by Plaintiff also runs afoul of Local Rule 56.1. Despite the "special solitude" afforded to *pro se* parties when considering a motion for summary judgment, "Pro se litigants are [] not excused from meeting the requirements of Local Rule 56.1" when a party moving for summary judgment provides notice to a *pro se* party consistent with Local Rule 56.2. *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009). A nonmoving *pro se* plaintiff must therefore "point to specific evidence in the record to carry his burden in summary judgment." *Bannister v. Luis*, 2022 WL 19402511, at *2 (E.D.N.Y. Oct. 27, 2022), *report and recommendation adopted as modified*, WL 2325680 (E.D.N.Y. Mar. 2, 2023). Plaintiff has not done so. Plaintiff's counterstatement simply "admits" 22 paragraphs in Marriott's Rule 56.1 Statement, and denies, or denies in part, the remainder – without any citation to evidence in the record to support those controverting opinions. *See, e.g.*, Dkt. 134 at 58 ("Denied. This is a complete and utter lie, as shown in this pleading and every other one filed.").

I note that these errors are common among *pro se* parties. Of course, that does not mean the Court can or should excuse them. But while Marriott is correct that, "Pursuant to Local Civil Rule 56.1[,] Defendant's statements are deemed to be admitted where Plaintiff has failed to specifically controvert them with citations to the record," *Knight v. New York City Hous. Auth.*, 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007), district courts have "broad discretion to determine whether to overlook a party's failure to comply with local court rules," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Given the Court's broad discretion and Plaintiff's *pro se* status, the Court will "overlook this defect and will deem admitted only those facts in [Marriott's] Rule 56.1 statement that are supported by admissible evidence and not controverted

4

by other admissible evidence in the record." *Young v. Nassau Univ. Med. Ctr.*, 2011 WL 6748500, at *1 n.2 (E.D.N.Y. Dec. 22, 2011). That, as it turns out, is most of the facts contained in Defendant's Rule 56.1 Statement.

Additionally, in light of Plaintiff's *pro se* status, the Court has conducted an "assiduous review of the record" to assess whether there is any evidentiary basis for Plaintiff's assertions and to determine whether any genuine issues of material fact would properly be asserted. *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000); *see also Geldzahler v. New York Med. Coll.*, 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010). After conducting that review I can say with complete confidence that no fact material to the outcome of this case is genuinely in dispute. *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 395 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, NY, 945 F.3d 83 (2d Cir. 2019).

The facts recited below are undisputed.

## 2. Factual History

### Parties

Plaintiff Lubos Naprstek ("Plaintiff") was born in the Czech Republic and emigrated to the United States. He is presently 61 years old; he was born on November 28, 1964. Pl. Tr. 32:14-17. Whether he is a citizen of the United States or not is unknown.

Naprstek has been employed since 1991 as an A-List Banquet Waiter at the JW Marriott Essex House Hotel (the "Hotel"), a 425-room luxury hotel located at 160 Central Park South in Manhattan. He remains employed there in that capacity today.

Plaintiff is one of approximately 20 A-List Banquet Waiters employed by Marriott at the Hotel. He testified that he is the second youngest of the A-List Banquet Waiters. Pl. Tr. 72:3-9.

A-List Banquet Waiters are primarily responsible for serving food and beverages to guests, cleaning and bussing tables, and providing customer service at banquet events held at the Hotel. Waiters are assigned banquet events on a strict rotational basis. The Hotel also maintains a roster of B-List Banquet Waiters, who are called upon to work events if there is a shortage of A-List Banquet Waiters. In other words, A-List Waiters have priority in obtaining work assignments.

Plaintiff and the other A-List Banquet Waiters are members of Hotel, Restaurant and Club Employees and Bartenders Union Local No. 6 (the "Union"). The terms and conditions of their employment are governed by a collective bargaining agreement ("Collective Bargaining Agreement" or "CBA") that has been in effect since 1992. The CBA applies to all banquet servers in New York City luxury hotels.

Clauses 26(A) and 26(K) of the July 2012 Collective Bargaining Agreement provide in relevant part:

> All complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement or any acts, conduct or relations between the parties, directly or indirectly, which shalt not have been adjusted by and between the parties Involved shall be referred to a permanent umpire(s) to be known as the Impartial Chairperson, and his/her decision shall be final and binding upon the parties hereto. Any questions regarding arbitrability, substantive, procedural, or otherwise, or regarding the impartial Chairperson's jurisdiction or authority, shall be submitted to the Impartial Chairperson In accordance with this Article .... The decision rendered by the Impartial Chairperson shall have the effect of a judgment entered upon an award made, as provided by the Arbitration Laws of the State of New York, entitling the entry of a judgment in a court of competent jurisdiction against the defaulting party who falls to carry out or abide by such decision.

6

Collective Bargaining Agreement, Clause 26(A), 26(K).[1]

Defendant Marriott Hotel Services, LLC ("Marriott") assumed operation of the Hotel in or around September 2012. After Marriott acquired the Hotel, it implemented two new rules that impacted the A-List Banquet Waiters: an 80% attendance policy (the "80% Rule") and a change in service charges paid by guests for banquet events without a corresponding change in the portion distributed to A-List Banquet Waiters. Both new policies led to disputes that were submitted to arbitration pursuant to the provisions of the CBA.

### The 80% Rule Arbitration Award

In or around July 2019, the Hotel introduced an attendance policy that would require A-List Banquet Waiters to work 60% (and later, 80%) of the banquet events hosted by the Hotel each month. *See* Dkt. No. 133 ¶ 11; Dkt. No. 130-6. Pursuant to the 80% Rule, the Hotel could terminate an A-List Banquet Waiter who failed to satisfy the 80% Rule three times. Dkt. No. 133 ¶ 11; Pl. Tr. 125:9-19.

Prior to the implementation of the 80% Rule, the Hotel only required A-List Banquet Waiters to work a minimum of one banquet event per month in order to remain in good standing and be eligible for benefits. Dkt. No. 133 ¶ 9. Marriott conveyed to the A-List Banquet Waiters that this overly flexible policy led to the unavailability of enough A-List Banquet Waiters to staff events and so compromised its ability to provide coverage and exceptional guest service for certain events. *Id.*

---

[1] As indicated in the Court's January 10, 2024 order granting the Union's motion for judgment on the pleadings, *see* Dkt. No. 73 at 4, the Court is working off the only version of the Collective Bargaining Agreement with which it was provided - the version that came into effect on July 1, 2012. Ex. A to Answer; Dkt. No. 12. That Agreement was due to expire by its terms on June 30, 2019. However, its renewal clause provides that: "The Agreement shall be renewed from year to year thereafter unless written notice of termination by certified mail, return receipt requested is given by either party to the other not less than sixty (60) days prior to its expiration." As no party has alleged that the agreement was terminated in accordance with this provision, the Court assumes that the agreement continues in effect, and that it was in force in September 2019, when the arbitration at the heart of this lawsuit took place.

The Hotel implemented the 80% Rule in part because two A-List Banquet Waiters in particular – Gary Knifer and Judith Hoover – regularly passed on shifts, and so worked very few functions in comparison to other A-List Banquet Waiters. *See* 80% Rule Arbitration Award, Dkt. No. 130-7 at 3. In 2018, for example, Knifer worked at fewer than 6% of functions, while Hoover worked at fewer than 9%. *Id.* By contrast, the Hotel's 18 other A-List Banquet Waiters (including Plaintiff) worked an average of 84.62% of functions. *Id.* This disparity in functions worked had apparently been allowed for some time prior to 2019 without endangering the status of Knifer and Hoover as A-List Waiters.

Despite the fact that they had historically worked more than 80% of the functions held at the Hotel, Plaintiff and the other A-List Banquet Waiters disliked the new Rule. Plaintiff believed it would limit his ability to pass on events for personal reasons – including when he might be tired and in need of rest – without risking termination. Dkt. No. 133 ¶ 12. The Union initially supported the waiters' position.

In accordance with the CBA, the Hotel commenced an arbitration against the Union before the Office of the Impartial Chairperson of the Hotel Industry (the "Impartial Chairperson"), seeking a declaration of its right to implement the 80% Rule. In November 2019, following an evidentiary hearing at which all parties were represented by counsel, the Impartial Chairperson ruled that the Hotel could implement the 80% Rule (the "80% Rule Arbitration Award"). *See* Dkt. No. 130-7; Dkt. No. 133 ¶ 14. The Impartial Chairperson found that the Hotel implemented the Rule "solely for its interest in promoting guest service," and "dismiss[ed], in the strongest possible terms, any allegation of retaliatory or discriminatory conduct by the Hotel" due to a lack of evidence. Dkt. No. 130-7 at 7.

But while the Impartial Chairperson upheld Marriott's right to impose the rule, he also held that Hoover and Knifer did not have to comply with the rule – apparently because it had not been historical practice to require them to work so many events. *See* Dkt. No. 133 ¶ 19. He noted that Marriott did not want to fire Hoover and Knifer,[2] but said that allowing them to work only a few events each month, in accordance with their "historical practice," would leave the Hotel understaffed, since it needed a minimum of 20 full time A-list Waiters in order to provide guests with the first-class service expected of Marriott. *See* Dkt. No. 130 at 7. So the Impartial Chairperson agreed to Marriott's suggestion that it be allowed to "red circle" Hoover and Knifer. "Red circling" (more precisely known, in this context, as "grandfathering") is a labor relations tool that, in sum and substance, allows an employee to be exempted from following newly instituted rules while maintaining positions that would otherwise be subject to those rules. *See, e.g., Nelson v. Yale Univ.*, 2008 WL 2705188, at *1 (D. Conn. July 9, 2008). "Red circling" these two employees allowed them to maintain their status as A-List Banquet Waiters (*i.e.*, the best paid waiters) while freeing up two full-time positions, which the Hotel could then fill from the B-List on the basis of seniority. *See* Dkt. No. 130 at 7. This solution was incorporated into the Award.

Plaintiff believes the 80% Rule Arbitration Award was the product of fraud and collusion between the Impartial Chairperson, the Union, and the Hotel. He believes that the Impartial Chairperson signed an Award that was drafted by the Hotel and the Union, rather than drafting the Award himself. *Id.* ¶ 15.

---

[2] No one explains why Marriott did not want to fire Holland and Knifer. I am guessing that it is because they had a great deal of seniority, which might have created different problems with the Union and led to more arbitration or litigation. But I really do not know.

### The Service Charge Arbitration Award

A-List Banquet Waiters are paid in accordance with the CBA, which sets forth different pay rates for different tasks associated with a banquet. Dkt. No. 133 ¶ 21. A-List Banquet Waiters are also eligible for a portion of the mandatory service charges paid by banquet guests. *Id.*

In or around April 2014, the Hotel increased the mandatory banquet services charges imposed on banquet guests, but did not increase the percentage of the service charge distributed to A-List Banquet Waiters. *Id.* ¶ 22. Instead, the Hotel retained the entire increase. *Id.*

The Union initiated an arbitration against the Hotel, seeking an increase in the portion of the service charge distributed to A-List Banquet Waiters. *Id.* In November 2019, again following an evidentiary hearing, the Impartial Chairperson ruled in favor of the Union and awarded a prospective increase in the percentage of the service charge that was to be distributed to A-List Banquet Waiters, as well as a two-year retroactive payment to the Waiters (the "Service Charge Arbitration Award"). *Id.*; Dkt. No. 130-8.

Even though the Union won this arbitration, Plaintiff believes the Service Charge Arbitration Award was the product of collusion between the Union, Marriott, and the Impartial Chairperson. He surmises this because he believes the calculation of the retroactive payment was incorrect. Dkt. No. 133 ¶ 23. Plaintiff initiated this lawsuit, in part, to have the Service Charge Arbitration Award overturned and to seek monetary damages based upon what he believes was a miscalculation of the retroactive payment. Pl. Tr. 197:24-198:5, Dkt. No. 130-3. Significantly, Plaintiff does not contend that the service charge rule change is in any way discriminatory or retaliatory; he simply believes that the monetary award was miscalculated. *See* Pl. Tr. 194:4-13; 196:4-197:2.

**Challenges to the Arbitration Awards**

Plaintiff, together with approximately ten other A-List Banquet Waiters, complained to Marriott about the 80% Rule Arbitration Award and the Service Charge Arbitration Award. Dkt. No. 133 ¶ 25. The Waiters expressed their belief that the 80% Rule was unfair and "discriminatory" because Hoover and Knifer were not required to comply with the Rule while the other Waiters were. *See* Pl. Tr. 202:1-4. Plaintiff retained counsel and communicated with other A-List Banquet Waiters to outline a path to challenge both awards. Dkt. No. 133 ¶ 26.

Plaintiff also independently filed an unfair labor practice charge ("ULP") with the National Labor Relations Board ("NLRB") in January 2020, in which he faulted the Union for "refusing to overturn an arbitration award that is repugnant to the [NLRA] regarding Banquet server employees." Dkt. 130-11.

Plaintiff subsequently withdrew his ULP. He contends that he did so because he was told, by "the Union" and/or Stamatis Efstratiou ("Stamatis"), the Union delegate for the Hotel's A-List Banquet Waiters, that the Union intended to lodge a challenge to the arbitration awards on behalf of the A-List Banquet Waiters. Dkt. No. 133 ¶ 28.

The Union did not, however, challenge either the 80% Rule Arbitration Award or the Service Charge Arbitration Award. Plaintiff acknowledged in his deposition that he does not know why the Union ultimately chose not to challenge the awards or whether Marriott in any way influenced this decision. Pl. Tr. 178:1-4; 178:24-179:3. Plaintiff contends that he withdrew his ULP because he was misled about the Union's intentions.

Plaintiff also believes that he was harassed by his coworkers because of his vocal opposition to the rule changes. *See* Pl. Tr. 51:21-53:3. Three of his coworkers told Plaintiff that

he was causing trouble for them and even intimated that Plaintiff might lose his job if he continued to challenge the rule changes. *See* Pl. Tr. 220:16-221:5; 223:13-18.

Most of what Plaintiff refers to as "bullying," however, came from Stamatis, who was angry when Plaintiff ignored his advice and proceeded to file his January 2020 charge with the NLRB. Pl. Tr. 224:3-11. On multiple occasions, Stamatis told Plaintiff that he would lose his job if he continued to challenge the rule changes. Pl. Tr. 224:3-8. Plaintiff also overheard Stamatis refer to him as an "fucking uneducated Communist," express that Plaintiff is "dumb" and "misunderstood," and say "you don't go against the union." Pl. Tr. 234:6-11. He also referred to Plaintiff on at least one occasion as an "uneducated Czech," referencing Plaintiff's native country. Pl. Tr. 232:12-19.

Plaintiff admitted at his deposition that Stamatis' remarks were always made in the context of expressing anger over Plaintiff's mounting challenges to the rule changes over the opposition of the Union; they were not made in any other context. Pl. Tr. 232:20-233:9. Plaintiff also testified that Stamatis only began making such remarks when Plaintiff started opposing the rule changes and the arbitration outcomes. Pl. Tr. 229:20-24; 231:11-15. Prior to that time, Plaintiff had considered Stamatis to be a "very good friend." Pl. Tr. 229:20-230:4. Stamatis' hostile remarks ceased after March 2020. *See* Pl. Tr. 229:7-15.

Plaintiff testified that he did not inform Marriott of Stamatis' (or anyone else's) harassment prior to filing his complaint in this lawsuit. *See* Pl. Tr. 235:22-25.

As noted above, Plaintiff remains employed by Marriott as an A-List Banquet Waiter. He has not been suspended or otherwise disciplined since he first complained about the rule changes and arbitration awards, nor has his pay been reduced. Pl. Tr. 223:1-12. He has not, in short, suffered any adverse employment consequences at the hands of Marriott.

12

### 3. Procedural History

Plaintiff – then represented by counsel – filed the Complaint in this lawsuit on October 18, 2021. He asserted claims against Marriott for discrimination and retaliation under the New York State Human Rights Law ("NYSHRL"), New York City Human Rights Law ("NYCHRL"), and 42 U.S.C. § 1981. He also asserted a claim under 29 U.S.C. § 185, the Labor Management Relations Act ("LMRA") against both Marriott and the Union – against Marriott for breach of the Collective Bargaining Agreement, and against the Union for breach of the duty of fair representation in that the Union failed to take an appeal from or otherwise challenge the arbitration awards, as well as for its alleged concealment of that fact until April 2021. *See* Complaint ¶¶ 73-74.

On June 15, 2022, counsel for Plaintiff filed a motion for leave to withdraw, on the ground that he had irreconcilable differences with his client. Dkt. No. 37. After an in-person hearing, the Court granted that motion and gave Plaintiff 90 days to find new counsel. *See* Dkt. No. 40. New counsel never appeared and Plaintiff has been proceeding *pro se* for the last four years.

On August 8, 2023, the Union filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), arguing that Plaintiff's Complaint did not state a viable claim against the Union. *See* Dkt. No. 52. This Court granted that motion on January 10, 2024, dismissing with prejudice Plaintiff's ninth cause of action under the LRMA as against both Marriott and the Union. Dkt. No. 73. As explained in that decision, the Union had no duty to appeal an unfavorable arbitration decision, and so it could not have breached its duty of fair representation by failing to do so. *See* Dkt. No. 73 at 20-21. This was especially true given that the CBA provides that rulings by the Impartial Chairperson "shall be final and binding upon the

13

parties." *Id.* at 20. With respect to the allegation of concealment, the Court explained that the Union discharged its duty to its members by notifying Stamatis, the Union representative, about its decision. Any failure by Stamatis to communicate the Union's decision not to appeal to the Waiters could only give rise to a claim against Stamatis – not against the Union. *See id.* at 26.

On June 27, 2024, over two and one half years after filing suit, Plaintiff filed a motion for leave to file an amended complaint, seeking to add new claims against Marriott, to add Stamatis as a defendant, and to reinstate the Union as a defendant. *See* Dkt. No. 97. The proposed amended complaint would also have withdrawn Plaintiff's claims of national origin and alienage discrimination.

Magistrate Judge Sarah Cave, who was handling pretrial matters, denied Plaintiff's motion for leave to amend on October 9, 2024. *See* Dkt. No. 107. No appeal from her decision was taken to this Court. As a result, the original Complaint remains the operative pleading.

On July 17, 2025, Marriott moved for summary judgment dismissing the Complaint pursuant to Federal Rule of Civil Procedure 56. *See* Dkt. Nos. 129, 132. Plaintiff filed his opposition to Marriott's motion and a cross-motion for summary judgment on August 8, 2025. *See* Dkt. No. 134. Marriott filed its opposition to Plaintiff's summary judgment motion and reply in support of its own summary judgment motion on September 12, 2025. *See* Dkt. No. 139. Plaintiff was given until September 19, 2022 to file a reply brief, *see* Dkt. No. 137, but he did not do so. As a result, the motion was deemed fully briefed as of that date.

Nearly three months later, on December 10, 2025, Plaintiff filed a "Motion to Vacate the 80% Policy and Counter-Reply in Support of Plaintiff's Motion for Summary Judgment and in Objection to Defendant's Motion for Summary Judgment." Dkt. No. 142 at 2. This document purported to add into the case Plaintiff's attack on the 80% Rule. It also constituted a belated

14

reply, though for the most part the filing did nothing except rehash arguments Plaintiff had already made. Plaintiff did add a reference to an accident (apparently an automobile accident) suffered by a fellow A-List Waiter who was on his way home, allegedly after working multiple consecutive shifts. *See* Dkt. No. 142 at 3-4. Plaintiff described what he understood his colleague's injuries to be and insisted that the colleague had been injured as a result of the 80% Rule – though he did not explain what about the Rule required people to work "a double or triple shift without any sleep." *Id.* at 3. He specifically stated that the problem was that the policy did not apply to Holland and Knifer but did apply to "the rest of us." *Id.* at 4. That, of course, was the argument he originally made.

Marriott asked the Court to strike or disregard Plaintiff's belated filing on grounds that it was procedurally improper. *See* Dkt. No. 143. On January 15, 2026, *see* Dkt. No. 146, I advised the parties that I would not consider any "counter reply" or other filings that were transmitted to the Court without leave of court after the date for filing reply papers had passed.

### Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986)). Where both parties have moved for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 314 (2d Cir. 1981).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways. Fed. R. Civ. P. 56(c)(1). It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations," "admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *see generally Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988). Either way, a non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Crawford v. Dep't of Investigation*, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007), *aff'd*, 324 F. App'x 139 (2d Cir. 2009) (internal quotations omitted). He or she "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [his or her] version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). In other words, "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Statements that are devoid of any specific, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) (citation omitted). Likewise,

"conclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." *Ridinger v. Dow Jones & Co.*, 651 F.3d 309, 317 (2d Cir. 2011) (quotations omitted).

In cases involving claims of employment discrimination, "an extra measure of caution is merited" because "direct evidence of discriminatory intent is rare[,] and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quotations omitted). Even in the employment discrimination context, however, a plaintiff must provide more than conclusory allegations to defeat a motion for summary judgment. *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *Taylor v. Dollar Tree Stores*, 2020 WL 2478663, at *2 (E.D.N.Y. May 13, 2020). It is therefore "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

Although a *pro se* litigant is subject to the same summary judgment standard, he or she "should be given special latitude in responding to [a summary judgment] motion." *Gonzalez v. Long*, 889 F. Supp. 639, 642 (E.D.N.Y. 1995); *see also Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988). A court must therefore read a *pro se* party's supporting papers "liberally . . . and interpret them to raise the strongest argument they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Nevertheless, proceeding *pro se* does not relieve a litigant from the usual requirements of summary judgment. *See Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995). Accordingly, "*pro se* plaintiffs may not rely only on the pleadings to defeat defendant's motion for summary judgment;" they "must still point to specific evidence in the record to carry their burden in summary judgment." *Brown v. City of New York*, 2023 WL 4548339, at *4 (S.D.N.Y. July 14, 2023) (cleaned up) (citation omitted).

## Discussion

Plaintiff's Complaint asserts causes of action against Marriott for age discrimination, national origin/alienage discrimination, and retaliation. The record evidence, however, tells a different story.

According to his own sworn testimony, Plaintiff was not "intentionally mistreated" by anyone at Marriott due to his age or national origin. Pl. Tr. 47:5-11; 215:25-216:14; 217:17-220:3. By his own admission, he commenced this lawsuit to obtain relief from the arbitration awards he had long opposed. *See* Pl. Tr. 42:23-43:10; 43:25-44:5. The instant lawsuit thus presents a "classic example of a losing party seizing upon a pretext for invalidating an arbitration award." *Nat'l Bulk Carriers, Inc. v. Princess Mgmt. Co.*, 597 F.2d 819, 820 (2d Cir. 1979) (citation omitted).

The Court assesses Plaintiff's discrimination and retaliation claims under the NYCHRL, which supplies the most lenient liability standard. *See C.C. v. Google, LLC*, 2025 WL 1938809, at *6 (S.D.N.Y. July 15, 2025). Because Plaintiff fails to raise any genuine issue of material fact with respect to any of his NYCHRL claims, his claims necessarily fail under the NYSHRL and, to the extent applicable, federal law. *See Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 295 n.123 (S.D.N.Y. 2012).

## I.    THERE IS NO BASIS UPON WHICH TO VACATE THE ARBITRATION AWARDS

The Complaint does not allege a cause of action challenging the arbitration awards. But in his summary judgment briefing, Plaintiff asks the Court to vacate both the 80% Rule Arbitration Award and the Service Charge Arbitration Award. *See* Dkt. No. 134 at 25. With respect to the 80% Rule Arbitration Award, Plaintiff contends that it must be vacated because it "is discriminatory in nature and acts as a vessel for theft." *Id.* He further asserts that the award

18

"has elements of discrimination, unjust enrichment and various violations of human rights including sex crimes and modern day slavery with deadly consequences." *Id.* at 18.

There are three separate reasons why the Court cannot give Plaintiff the relief he seeks.

First, it is well settled that "Plaintiffs may not raise new arguments – or claims – for the first time in their summary judgment motion." *Grosso v. AT&T Pension Benefit Plan*, 2022 WL 2533000, at *4 (S.D.N.Y. July 7, 2022). This is true even in cases filed by *pro se* litigants.[3] *Clark v. Hutchinson*, 2026 WL 445299, at *13 (S.D.N.Y. Feb. 17, 2026) (collecting cases).

The Complaint does not plead any cause of action addressed to the vacatur of the arbitration awards. Even Plaintiff's proposed amended complaint (which he was ultimately not allowed to file) did not contain such a claim. Plaintiff made this request for the first time in his opposition to Marriott's motion for summary judgment – a motion addressed to the claims that *are* pleaded in the Complaint – and in support of his own cross-motion for summary judgment. For this reason alone, the Court cannot grant him the relief he seeks and vacate the awards.

Second, if Plaintiff had made a proper request for vacatur of the awards in a properly filed pleading, his application would have been denied as time-barred. A party has ninety days from the receipt of a labor arbitration award to petition for vacatur. *Trs. of New York City Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund & Apprenticeship, Journeyman Retraining, Educ. & Indus. Fund v. Everlast Scaffolding Inc.*, 2025 WL 903297, at *13 (S.D.N.Y. Mar. 25, 2025); *Orange & Rockland Utilities, Inc. v. Loc. 503, Int'l Bhd. of Elec. Workers*, 2006 WL 1073049, at *2-3 (S.D.N.Y. Apr. 21, 2006). Here, there is no question that Plaintiff's vacatur request was not made to this Court within ninety days of his receipt of the

---

[3] I note that Plaintiff was previously represented by counsel who drafted his Complaint and filed the lawsuit on his behalf. Dkt. No. 1.

awards in November 2019.[4]  It was made when he filed his motion papers in August 2025. Even

if the original Complaint could be read to contain  such a request (it did not), the Complaint was

not filed until October 2021 – well more than 90 days after receipt of the awards.

Third, there is no merits-based reason why the Court could vacate either of the arbitration

awards.[5]

Enforcement of an arbitration award issued under a collective bargaining agreement is

governed by Section 301 of the LMRA.[6] *Trs. of the New York City Dist. Council of Carpenters*

*Pension Fund v. High Performance Floors Inc.*, 2016 WL 3194370, at *2 (S.D.N.Y. June 6,

2016) (citing *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n, Nos.*

*15-2801, 15-2805*, 2016 WL 1619883, *5 (2d Cir. Apr. 25, 2016)). "Section 301 of the Labor

Management Relations Act (LMRA), 29 U.S.C. § 185. . . provides federal courts with

jurisdiction over petitions brought to confirm labor arbitration awards." *Local 802, Associated*

*Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 88 (2d Cir. 1998). Judicial

review of a labor arbitration award under the LMRA is "narrowly circumscribed and highly

deferential." *ABM Indus. Grps., L.L.C. v. Int'l Union of Operating Eng'rs, Loc. 30, 30A, 30B,*

*AFL-CIO*, 968 F.3d 158, 161 (2d Cir. 2020) (quotation omitted). A court "may not review the

arbitrator's decision on the merits, but inquire only as to whether the arbitrator acted within the

---

[4] The limitations period for challenging the awards ran in February 2020 – which was prior to the commencement of the COVID crisis and any extension of the statute of limitations as a result of that crisis.

[5] I address the merits only because Plaintiff is proceeding *pro se*, so that he understands that there is absolutely no basis on which this Court could vacate the awards, even if he had made a timely and proper request that I do so.

[6] "Where a party seeks to have an arbitration award vacated, the policies of section 301 and the [Federal Arbitration Act] are analogous . . . as both recognize the importance of arbitration and provide for limited judicial review of arbitral decisions." *HRH Const., L.L.C. v. Loc. No. 1, Int'l Union of Elevator Constructors, AFL-CIO*, 2005 WL 31948, at *4 (S.D.N.Y. Jan. 5, 2005) (internal citation and quotations omitted).

scope of his authority as defined by the collective bargaining agreement." *Id.* (quotations

omitted). As the United States Supreme Court has explained,

> Collective-bargaining agreements commonly provide grievance procedures to settle disputes between union and employer with respect to the interpretation and application of the agreement and require binding arbitration for unsettled grievances. In such cases, ... the courts play only a limited role when asked to review the decision of an arbitrator. The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract.

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36, (1987). Accordingly,

an arbitration award must be confirmed as long as it "draws its essence from the collective

bargaining agreement and is not merely the arbitrator's own brand of industrial justice." *Nat'l*

*Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 537 (2d

Cir. 2016) (quotations and citation omitted).

Plaintiff asserts that the arbitration awards were the product of fraud and collusion

between the Impartial Chairperson, the Union, and Marriott. But he offers no evidence to support

those claims. The awards were issued pursuant to the CBA following evidentiary hearings,

during which all participants (including the Union as Plaintiff's representative) were represented

by counsel. The reasons Plaintiff assigns as "fraud" are nothing of the kind. When asked why he

believes that the 80% Rule Arbitration Award was fraudulent, Plaintiff testified that he believes

the Award "was proposed to [the Impartial Chairperson], drafted by the union and the Marriott

attorneys presenting him to sign it." Pl. Tr. 160:21-161:6. Plaintiff acknowledged, however, that

he did not have specific information to support this assertion, *see* Pl. Tr. 161:14-162:25, and even

if he did, that does not constitute "fraud." With respect to the Service Charge Arbitration Award,

Plaintiff believes it was the result of collusion simply because the calculation of the amount of

the retroactive payment due him was incorrect. Dkt. No. 133 ¶ 23; Dkt. No. 134 ¶ 23.

In other words, the "fraud" is the fact that Plaintiff disagrees with the substance of the awards. That is not "fraud." Plaintiff wants this Court to review the awards on their merits and alter the results. That I cannot and will not do.

Nothing in the record even remotely suggests – and Plaintiff does not argue – that the Impartial Chairperson acted outside the scope of his authority as defined by the Collective Bargaining Agreement. Therefore, there is no basis upon which to vacate the awards.

For each of these three reasons, Plaintiff's belated request for vacatur of the awards is denied.

## II.   PLAINTIFF'S AGE DISCRIMINATION CLAIMS (COUNTS 1-4) ARE DISMISSED

Marriott argues that it is entitled to summary judgment on Plaintiff's age discrimination claims under the NYSHRL and NYCHRL.

As noted above, Plaintiff does not contend that he was "intentionally mistreated" because of his age. Tr. 47:5-11.[7] Of course, "mistreatment" is not necessarily synonymous with "discriminated against." Therefore, I cannot rely on this testimony to dismiss the claims of age discrimination out of hand. But it is certainly some evidence that casts considerable doubt on their viability.

To the extent that Plaintiff's age discrimination claim is an attack on the 80% Rule or the arbitration award – and, as will be seen below, that is exactly what it is – it lacks any merit, because it is simply an attack on the 80% Rule Arbitration Award dressed up as an age discrimination claim.

---

[7] It is probable that Plaintiff should have been allowed to amend his pleading to drop this claim, which he tried to do. The Magistrate Judge, for whatever reason, disallowed that. Therefore, it remains in the case.

However, assuming *arguendo* that it is possible for Plaintiff to contend that a key aspect of a valid arbitration award issued pursuant to a CBA governed by federal labor law discriminates against him on the basis of age, his argument fails applying traditional age discrimination principles.

I will consider his claim under both disparate impact and disparate treatment principles.

### 1. Disparate Impact

Establishing a disparate impact claim under the NYCHRL requires a plaintiff to demonstrate that: (1) "a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter"; and (2) "the covered entity fails to plead and prove as an affirmative defense that each such policy or practice bears a significant relationship to a significant business objective of the covered entity or does not contribute to the disparate impact." N.Y.C. Admin. Code § 8–107(17)(a)(1)–(2); *Teasdale v. New York City Fire Dep't, FDNY*, 574 F. App'x 50, 51-52 (2d Cir. 2014). "The mere existence of a statistical imbalance between a covered entity's challenged demographic composition and the general population is not alone sufficient to establish a prima facie case of disparate impact violation unless the general population is shown to be the relevant pool for comparison, the imbalance is shown to be statistically significant and there is an identifiable policy or practice or group of policies or practices that allegedly causes the imbalance." N.Y.C. Admin. Code § 8–107(17)(b).

Plaintiff alleges that the 80% Rule disproportionately impacts "older and longer-termed banquet waiters." *See* Complaint ¶¶ 57, 59, 61, 63; Pl. Tr. 46:11-48:10. Specifically, he says that the 80% Rule adversely impacts older and longer-tenured workers "who simply would not be physically able to work the exorbitant 80% of the available hours that their younger counterparts

were better positioned, physically, to perform due to the sudden work loads and irregular hours that no human should be forced to do." Dkt. No. 134 at 40. He buttresses this wholly conclusory statement with an undated article by an unknown author that appeared in some unknown publication. It is entitled, "The Detrimental Impact of Excessive Workloads on Banquet Waiters." Dkt. No. 134 at 72. The article states, in relevant part, that, "While overwork can be harmful to individuals of any age, older workers are particularly vulnerable. Their bodies may not recover as quickly, and the risk of developing work-related health issues increases significantly. Moreover, some studies have suggested that burnout has been observed in higher numbers specifically in elder woman than in men." *Id.* at 74. That is the extent of the "evidence" he provides to support his disparate impact claim.

The bare assertion that the 80% Rule "adversely impacted older workers," without more, is wholly insufficient to survive a summary judgment motion. *See Gittens-Bridges v. City of New York*, 2022 WL 954462, at *17 (S.D.N.Y. Mar. 30, 2022), *aff'd*, 2023 WL 8825342 (2d Cir. Dec. 21, 2023). The report – Plaintiff's "evidence" – is, of course, hearsay, and so is inadmissible and does not create any genuine issue of material fact. Nor would it create a genuine issue of fact if it were admissible, since it does not address the precise policy that Plaintiff here attacks as discriminatory. Plaintiff does not back the report's conclusions up with relevant evidence – evidence, for example, that his older colleagues were retiring and being replaced by younger workers because they are worn out from being forced to work 80% of the time and could no longer keep up the pace. He offers no evidence whatsoever on that score. Plaintiff himself is still working; he has not been replaced by a younger worker.[8]

---

[8] And while the Court disallowed Plaintiff's belated filing, I will note that his opinion that his fellow worker's automobile accident occurred as a result of the 80% Rule is inadmissible lay opinion testimony, because it is not "rationally based on the witness's perception." Fed. R. Ev. 701(a). Plaintiff's own statement is that the accident

So Plaintiff fails to raise any genuine issue that Marriott's 80% Rule discriminates against older workers.

But let us assume that Plaintiff could get past the first step. He fails utterly at the second. Even if Plaintiff had demonstrated that the 80% Rule disparately impacts older A-List Banquet Waiters, Marriott has pleaded and proved that the 80% Rule has a "significant relationship to a significant business objective." N.Y.C. Admin. Code § 8–107(17)(a)(2). Therefore, it cannot be the basis of an age discrimination claim.

There is no genuine dispute that the Hotel implemented the 80% Rule because of a legitimate business need: to ensure appropriate A-List Banquet Waiter staffing levels in order to provide exceptional customer service to guests. Dkt. No. 132 ¶¶ 9, 10, 14; Dkt. No. 134 at 56-57; Pl. Tr: 131:5-13; 164:6-19. A labor arbitrator found as much after a full evidentiary hearing. Under the previous policy, certain A-List Banquet Waiters were permitted to "pass" on events, depriving the Hotel of a full complement of A-List Banquet Waiters available for work. *See* Dkt. No. 132 ¶ 17; Dkt. No. 134 at 57. The Impartial Chairperson agreed with the Hotel during the arbitration that implementing the 80% Rule was "important and necessary for the Hotel to continue to offer and provide high quality banquet service to its guests and clients." Dkt. 130-7 at 7. Plaintiff conceded at his deposition that he has no reason to disbelieve Marriott's stated reason for implementing the 80% Rule. *See* Pl. Tr. 165:5-13.  Tr, 189:6-190:4. The policy was not, in short, implemented in order to have a disparate impact on older workers, or for any reason relating to age.

---

resulted from the employee's working "double or triple shifts" – something that is nowhere required by the 80% Rule.

## 2. Disparate Treatment

But Plaintiff does not really plead a disparate impact claim. His real complaint is that two A-List Banquet Workers – Hoover and Knifer – were exempted from compliance with the 80% Rule, while he – who is younger than at least one of them must be – must comply with the Rule. "Such an allegation sounds not in disparate impact, but in disparate treatment." *De La Fuente v. Sherry Netherland, Inc.*, 2018 WL 1597649, at *6 (S.D.N.Y. Mar. 27, 2018).

To prevail on a disparate treatment claim under the NYCHRL, "the plaintiff need only show that [his] employer treated [him] less well, at least in part for a discriminatory reason." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n. 8 (2d Cir. 2013). A defendant may present evidence of a legitimate, non-discriminatory motive to show that the conduct was not caused by discrimination, but it is entitled to summary judgment only if the record establishes as a matter of law that "discrimination played no role in its actions." *Id.* (cleaned up).

Again, I emphasize this this is simply a dressed-up attack on the Arbitration Award. A labor arbitrator decided that Hoover and Knifer could and should be "red circled" and excused from compliance with the 80% Rule because they was consistent with their prior work history, while the work history of the other A-List Waiters was consistent with the 80% Rule. That Award is final and unassailable. Plaintiff cannot get around it by contending that Hoover and Knifer got special treatment that was not made available to him and his co-workers.

But assuming *arguendo* that the state or city human rights laws have anything to say on the matter, Plaintiff loses because the record in this case establishes as a matter of law that age discrimination played no role, either in Marriott's decision to ask the Impartial Chairperson to "red circle" Hoover and Knifer, or in the Impartial Chairperson's decision to grant that request.

26

Rather, the basis for this request and the Impartial Chairperson's ruling was the fact that "historical precedent" established that these two unionized employees – and only these two employees – had traditionally worked far fewer events than the other A-List Banquet Waiters, at a time when no A-List Waiter had to work more than one event a month. There is not a scintilla of evidence in the record tending to show that the reason for this "historical precedent" was their age. Age is not mentioned in Marriott's request or in the Impartial Chairperson's Award. Veronica Stewart, Marriott's Director of Human Resources, testified that Hoover and Knifer were excluded from compliance with the 80% Rule because for many years they had been allowed to pass on functions that they were assigned to work, and the Hotel did not want to negatively impact them "because this had been a practice that had been allowed for years specifically to [Hoover] and [Knifer]." Stewart Tr. 11:7-25, Dkt. No. 130-4. The Impartial Chairperson found this to have been the case. The evidence presented to him was consistent with Stewart's testimony, revealing that Hoover and Knifer had for many years worked very few functions in comparison to other A-List Banquet Waiters. Dkt. No. 130-7 at 3. Age was never mentioned. In fact, we do not know the age of either Hoover or Knifer, or of any other waiter besides Naprstek; the record is silent on the subject.[9]

Therefore, there is no basis on which a reasonable trier of fact could conclude that Hoover and Knifer were exempted from compliance with the 80% Rule on the basis of their age. Marriott has thus proffered a legitimate, non-discriminatory reason for its decision to ask the Impartial Chairperson to "red circle" only Hoover and Knifer – and for the Impartial Chairperson to accede to that request in his Award. Plaintiff has not pointed to any admissible evidence – or

---

[9] Assuming that Plaintiff is correct that he is the second youngest among the A-List Banquet Waiters, it would appear that at least one of these two is older than he. The other might be older or younger. We have no idea since we do not know the age of either of them.

any evidence, for that matter – suggesting that Marriott's stated reason (historical precedent) was pretextual, or that any differential treatment was based on anyone's age as opposed to some historical practice that appears to have been sanctioned by the Union with respect to these two workers for many years. *See Bryant v. Verizon Commc'ns, Inc.*, 550 F.Supp.2d 513, 535 (S.D.N.Y. 2008). It may not feel fair to Plaintiff – it might not even look fair to an outsider – but there is no evidence that it is a product of age discrimination. *See Gittens-Bridges*, 2022 WL 954462, at *15.

Because Plaintiff's age discrimination claims fail under the NYCHRL, which provides the most lenient liability standard, *see C.C. v. Google, LLC*, 2025 WL 1938809, at *6 (S.D.N.Y. July 15, 2025), they necessarily fail under the NYSHRL. *See Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 295 n.123 (S.D.N.Y. 2012).

Marriott's motion for summary judgment dismissing Counts 1-4 is GRANTED.

### III.    PLAINTIFF'S NATIONAL ORIGIN DISCRIMINATION CLAIMS (COUNTS 5-6) ARE DISMISSED[10]

Marriott next contends that it is entitled to summary judgment dismissing Plaintiff's national origin discrimination claims, which are asserted under the NYCHRL and NYSHRL. The Court agrees.

#### 1. Disparate Treatment

Plaintiff asserts that the 80% Rule is also discriminatory because the two A-List Banquet Waiters who were excluded from compliance with the Rule were "American-born," whereas Plaintiff was of Czech origin. *See* Pl. Tr. 48:24-49:22; 50:23-51:7. This is a disparate treatment

---

[10] Once again, the Court notes that only because the learned Magistrate Judge denied the motion for leave to amend in its entirety are these claims still in the case; Plaintiff was prepared to drop them. *See* Dkt. No. 97.

claim. *See Fitchett v. City of New York*, 2021 WL 964972, at *22 (S.D.N.Y. Mar. 15, 2021) (collecting cases).

As was the case with his disparate treatment age discrimination claim, Plaintiff has failed to offer any admissible evidence tending to show that his Czech ancestry had anything to do with why he was required to comply with the new Rule, while Hoover and Knifer were not. Plaintiff points to no evidence that his Czech origin played any role in Marriott's decision to ask to "red circle" only Hoover and Knifer, or that his national origin was ever called to the attention of the Impartial Chairperson, let alone served as a basis for that arbitrator's decision to "red circle" those two individuals. Giving the lie to any suggestion that the decision to exempt Hoover and Knifer was rooted in national origin discrimination is Plaintiff's testimony that he was never treated unfairly on the basis of his Czech heritage, *see* Pl. Tr. 51:21-52:3, and his admission that at least four other A-List Banquet Waiters who, like Plaintiff, were required to comply with the 80% Rule were "American-born," just as Hoover and Knifer were. Pl. Tr. 50:5-18.

### 2. Hostile Work Environment

In his original Complaint, Plaintiff asserted that he was subjected to a hostile work environment on the basis of his national origin. That claim, too, must be dismissed because it is not supported by any evidence at all.[11]

To succeed on a hostile work environment claim based on discrimination under the NYCHRL, a plaintiff "need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d

---

[11] On October 9, 2024, Magistrate Judge Cave denied Plaintiff's motion to amend his Complaint to assert a hostile work environment claim because such an amendment would be futile. *See* Dkt. No. 107. However, Judge Cave's conclusions about the futility of a hostile work environment claim are not dispositive of Plaintiff's national origin discrimination claims based on a hostile work environment theory. That claim was asserted in his original Complaint, which remains the operative pleading in this case.

102, 110 (2d Cir. 2013). Unlike its federal counterpart, the NYCHRL does not require that the alleged hostile conduct be "severe or pervasive." *See Gilani v. Deloitte LLP*, 2024 WL 4042256 (S.D.N.Y. Sept. 4, 2024). But a plaintiff must still show that his protected status was the "motivating factor behind any workplace hostility." *Boonmalert v. City of New York*, 721 F. App'x 29, 34 (2d Cir. 2018). And because the NYCHRL "is still not a general civility code…. petty slights and trivial inconveniences are not actionable." *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 671 (S.D.N.Y. 2012); *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011).

It is undisputed that, between November 2019 and March 2020,[12] Plaintiff overheard Stamatis, his co-worker and Union delegate, calling him a "fucking uneducated Communist," saying Plaintiff is "dumb" and "misunderstood, and stating "you don't go against the union." Pl. Tr. 234:6-11. Stamatis would also "put [him] down because of academic level, education, [and] being Communist." Pl. Tr. 90:3-9. And Plaintiff testified that on at least one occasion Stamatis called him a "fucking uneducated Czech." Pl. Tr. 232:12-19.

These insults are indeed regrettable and unbecoming. But they did not create a hostile work environment linked to Plaintiff's national origin.

Context matters here. According to Plaintiff, Stamatis linked his remarks to Plaintiff's attacks on the arbitration awards. He made the nasty remarks about Plaintiff only in that context – a fact Plaintiff admits, *See* Pl. Tr. 229:20-231:15; 231:12-15, 232:20-233:9. And he made those remarks only during the brief four month period when Plaintiff was actively contesting the awards; the remarks stopped in March of 2020. *See* Pl. Tr. 234:2-5. So even if Stamatis' remarks could be considered anything more than the type of "petty slights and trivial inconveniences"

---

[12] Plaintiff testified that Stamatis stopped making comments like this to him around March 2020. *See* Pl. Tr. 229:7-15.

that are not actionable under even the more lenient NYCHRL standard, *Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 8 (2d Cir. 2017) – and I doubt that is the case, given both the context and their brief duration – Plaintiff has failed to offer any evidence from which a reasonable jury could infer that these remarks were made even in part in order to harass Plaintiff *because of his national origin. See e.g., Reichman v. City of New York*, 117 N.Y.S.3d 280, 285-286 (2020) (granting summary judgment to defendants on NYCHRL hostile work environment claim where defendants demonstrated that the remarks plaintiff complained of were merely petty slights and that even if he was treated less well, it was not because of his religion). Rather, all the evidence is to the effect that they were made to him because he opposed the Arbitration Awards. Plaintiff admits as much; he testified that Stamatis did not harass him on account of his Czech origin. *See* Pl. Tr. 51:21-52:3; 219:20-220:15; 230:8-231:10; 242:12-25. In light of this sworn statement, it would be impossible to conclude that Stamatis subjected Plaintiff to a hostile work environment because of his national origin.

The same is true of Plaintiff's co-workers who called him out for making their lives difficult. They were insulting Plaintiff because of his opposition to the awards, not because he was Czech. In fact, Plaintiff does not quote any of them as making any remarks about the fact that he is Czech.

Furthermore, neither Stamatis nor Plaintiff's other co-workers are defendants in this case. Judge Cave denied Plaintiff's motion to add Stamatis as a defendant in this lawsuit.[13] Her

---

[13] Judge Cave did not base her ruling on statute of limitations grounds. However, I am constrained to note that Plaintiff did not seek leave to add Stamatis as a defendant until June 2024. According to Plaintiff, Stamatis' comments stopped in March 2020. *See* Pl. Tr. 229:7-15. Ordinarily, a claim of hostile work environment based on these comments would have expired in March 2023, three years after the alleged harassment stopped. Because of the COVID toll, which added 228 days to the limitations period, the claim actually expired no later than sometime during October of 2023. So by the time Plaintiff sought to add Stamatis as a defendant it was too late to assert a national origin hostile work environment claim against him. I do not believe Plaintiff ever sought to add any of his other co-workers as defendants.

decision was not appealed to me. It is undisputed that Plaintiff never told anyone at Marriott about these comments prior to the commencement of this lawsuit; as Judge Cave explained in her decision denying Plaintiff's motion to amend his Complaint, such a report would have been necessary to raise an inference of discrimination by Marriott. *See Holt v. Dynaserv Indus., Inc.*, 2016 WL 5108205, at *11 (S.D.N.Y. Sept. 19, 2016).

The undisputed evidence also demonstrates that Stamatis – and the two other employees who Plaintiff alleges "bullied" him about his opposition to the Award – were not involved in making decisions about the terms and conditions of Plaintiff's employment. Even under the lenient standards of the City Human Rights Law, Plaintiff would have to prove that these individuals had some degree of control over his working conditions in order to hold Marriott, Plaintiff's employer, liable for creating a hostile work environment. He has failed to do so.

For the reasons set forth above, Marriott is entitled to summary judgment dismissing Counts 5 and 6. And again, dismissal of Plaintiff's national origin discrimination claims under the NYCHRL's more lenient standard means that the correlate claims asserted under the NYSHRL must also be dismissed. *See Campbell*, 860 F. Supp. 2d at 295 n.123.

## IV.   PLAINTIFF'S ALIENAGE DISCRIMINATION CLAIM (COUNT 7) IS DISMISSED

Marriot also moves for summary judgment on Plaintiff's alienage discrimination claim, which he asserts pursuant to 42 U.S.C. § 1981.

Alienage discrimination involves discrimination on the basis of an individual's foreign citizenship, not his immigration status or the fact that he is foreign-born. *Vaughn v. City of New York*, 2010 WL 2076926, at *10 (E.D.N.Y. May 24, 2010); *Ayiloge v. City of New York*, 2002 WL 1424589, at *15 (S.D.N.Y. June 28, 2002). Accordingly, "Discrimination on the basis of a

person's status as an immigrant to the United States is not alienage discrimination unless it is also motivated by the lack of U.S. citizenship." *Vaughn*, 2010 WL 2076926, at *10.

In order to establish alienage discrimination under Section 1981, a plaintiff must demonstrate: "(1) that he is an alien; (2) an intent to discriminate on the basis of alienage by the defendant; and (3) that the discrimination interfered with his right to make and enforce contracts." *Ayiloge*, 2002 WL 1424589, at *15. Claims of alienage discrimination are subject to the three-part burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973). *Id.*

Plaintiff's alienage discrimination fails because Plaintiff does not offer any evidence that he is not a citizen of the United States. It is really that simple. *See Ayiloge*, 2002 WL 1424589, at *16. There is no information in the record – not even in Plaintiff's pleading – from which a trier of fact could determine whether Plaintiff is or is not a citizen of the United States. Plaintiff relies on exactly the same factual allegations to support both his alienage claim and his national origin claims. *See* Complaint ¶¶ 46-48, 55, 66-67. But the fact that Plaintiff emigrated to the United States from the country of his birth does not mean that he is not a citizen of the United States. Thousands of immigrants are sworn in as citizens of this land every year. Perhaps at some point Plaintiff was one of them. Or perhaps he has been working with a green card for the 35 years that he has been employed as an A-List Waiter at the Hotel. We simply do not know.

Courts take great care to distinguish between alienage discrimination and national origin discrimination: "Alienage discrimination must be distinguished from national origin discrimination, which is based solely an individual's birthplace or nation of origin, and is not prohibited by § 1981." *Ayiloge*, 2002 WL 1424589, at *16. This is so because, while Section 1981 applies to discrimination on the basis of non-U.S. citizenship, it does not address

33

discrimination on the basis of national origin. *See Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998).

Because Plaintiff has not produced any evidence that he is not a citizen of the United States – that he is in fact an "alien" – Marriott is entitled to summary judgment dismissing Count 7 of Plaintiff's complaint.

## V.    PLAINTIFF'S RETALIATION CLAIMS (COUNT 8) ARE DISMISSED

Plaintiff alleges that he was "subjected to retaliatory animus in the extreme" in violation of the NYSHRL, NYCHRL, and 42 U.S.C. § 1981, because of his "vociferous advocacy in opposition to Marriott's unilateral imposition of policies . . . and because of his complaints concerning age discrimination, prior alienage national origin discrimination and a hostile working environment." Complaint ¶ 41. He alleges that, as a result of his advocacy, "Union Delegates, and other wait staff at the instigation of Union Delegates, have variously claimed that his complaints were jeopardizing their jobs as well as his own job, and resorted to bullying tactics against Plaintiff." Complaint ¶ 42.

While the text of 42 U.S.C. § 1981 does not expressly prohibit retaliation, the Supreme Court made clear in *CBOCS W., Inc. v. Humphries*, 553 U.S. 442 (2008) that workplace retaliation is actionable under Section 1981. Section 1981 retaliation claims are analyzed using the *McDonnell Douglas* three-part burden-shifting framework. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). A plaintiff can establish a prima facie case of retaliation by showing: (1) participation in a protected activity; (2) the defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Id*. at 844. But to establish a claim of retaliation under Section 1981, "the retaliation must have been in response to the claimant's assertion of

34

rights that were protected under Section 1981." *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998). Section 1981 prohibits intentional race-based discrimination in the workplace. *Ganthier v. N. Shore-Long Island Jewish Health Sys., Inc.*, 345 F. Supp. 2d 271, 281 (E.D.N.Y. 2004). It does not, however, prohibit discrimination based on national origin or age. *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998). Here, Plaintiff alleges only age and national origin discrimination, neither of which is prohibited by Section 1981. Nothing in the record even remotely suggests that he ever complained of racial discrimination. Plaintiff's Section 1981 retaliation claim must therefore be dismissed.

Turning to Plaintiff's retaliation claims under State and City law. "Retaliation victims are provided with broader protection under the NYCHRL — and, for purposes of this motion, under the post-amendment NYSHRL — than their federal counterpart." *Wright v. City of New York*, 2024 WL 3952722, at *10 (S.D.N.Y. Aug. 27, 2024); *see also Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122-23 (2d Cir. 2024) (indicating that the post-amendment NYSHRL retaliation standard aligns with the NYCHRL's retaliation standard). The elements of a prima facie retaliation claim under City and State law are identical to the elements of a Section 1981 claim, "except that the plaintiff need not prove any 'adverse' employment action; instead, [he] must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Leon v. Columbia Univ. Med. Ctr.*, 2013 WL 6669415, at *12 (S.D.N.Y. Dec. 17, 2013) (internal quotation marks omitted); N.Y.C. Admin. Code 8-107(7). Even under this less demanding standard, however, a "plaintiff still must establish that there was a causal connection between [his] protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for [the action] was pretextual or motivated at least in

part by an impermissible motive." *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018) (citation and internal quotation marks omitted).

"To establish its entitlement to summary judgment in a retaliation case under the NYCHRL (or the post-amendment NYSHRL), a defendant must demonstrate that the plaintiff cannot make out a prima facie claim of retaliation or, having offered legitimate, nonretaliatory reasons for the challenged actions, that there exists no triable issue of fact as to whether the defendant's explanations were pretextual." *Reichman v. City of New York*, 117 N.Y.S.3d 280, 286 (2020) (citation omitted). "Where a defendant produces evidence that justifies [his or her] allegedly retaliatory conduct on permissible grounds ... [t]he plaintiff must either counter the defendant's evidence by producing evidence that the reasons put forth by the defendant were merely a pretext, or show that, regardless of any legitimate motivations the defendant may have had, the defendant was motivated at least in part by an impermissible motive." *Id.* at 287 (citation omitted).

Marriott argues that Plaintiff fails to make out a prima facie case of retaliation because no reasonable jury could conclude that Plaintiff engaged in any "protected activity" within the statutory meaning of that term.

An employee engages in protected activity by "opposing or complaining about *unlawful* discrimination." *Clarson v. City of Long Beach*, 18 N.Y.S.3d 397, 398 (2015) (citation omitted) (emphasis added). A plaintiff is not required to show that the behavior he opposed in fact violated any particular anti-discrimination statute; he need only show that he had a good faith, reasonable belief that he was opposing an unlawful employment practice. *McKenzie v. Big Apple Training Inc.*, 2023 WL 4866041, at *8 (S.D.N.Y. July 31, 2023). But he must show that he was complaining about an unlawful employment practice.

If Plaintiff had indeed complained about "age discrimination, prior alienage national origin discrimination and a hostile working environment," he would almost certainly have made out a *prima facie* case, because such complaints constitute protected activity under one or more of the statutes under which he sues. Complaint ¶ 41. But the record evidence does not show that Plaintiff ever made any such complaints. To the contrary, Plaintiff testified at his deposition that he never complained to anyone at Marriott about being mistreated because of his age, alienage, or national origin. Pl. Tr. 217:24-218:25. Nor did Plaintiff ever complain to Marriott about being "bullied," by Stamatis or anyone else, which is the basis for his hostile work environment claim. Pl. Tr. 235:17-236:22.

The only complaints Plaintiff made to Marriott concerned his dissatisfaction with the outcome of the two labor arbitrations. He so testified under oath. Pl. Tr. 201:19-202:14; 211:7-16. But such a complaint cannot be the basis for a retaliation claim because it does not relate to any unlawful – i.e., statutorily forbidden – discriminatory practices. Although Plaintiff testified that the A-List Banquet Waiters complained to Marriott that the exclusion of Hoover and Knifer from compliance with the 80% Rule was "discriminatory," the mere incantation of the word "discrimination" does not convert an ordinary employment complaint into a protected activity. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 17 (2d Cir. 2013) ("Although particular words such as 'discrimination' are certainly not required to put an employer on notice of a protected complaint, neither are they sufficient to do so if nothing in the substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory"); *see also Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 124 (S.D.N.Y. 2020) ("Mere complaints of unfair treatment . . . are not protected speech" in the employment retaliation context, and the "onus is on the speaker to clarify to the employer that he

is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally") (quoting *Brantman v. Fortistar Capital, Inc.*, 2017 WL 3172864, at *7 (S.D.N.Y. July 22, 2017)). "Unlawful activity" encompasses complaining about age discrimination, alienage discrimination or national origin discrimination (or gender or religious discrimination). It does not include complaining about an arbitration award, even if the award seems unfair or wrong.

Plaintiff unquestionably felt that that he and others were being treated unfairly compared to Hoover and Knifer – the two employees who were allowed to continue as A-List Banquet Waiters without complying with the new 80% Rule, the ones who were "red circled." There is indeed a sense in which that is discriminatory. But there is no evidence that Plaintiff ever linked his complaint about not being given the same benefit as Hoover and Knifer to age, national origin, or status as an alien. Quite the contrary. Plaintiff complained that it was unfair to treat Hoover and Knifer more favorably than Plaintiff and the rest of the A-List Banquet Waiters. That is an ordinary employment complaint. It may even be a legitimate complaint. But it is not a complaint about "unlawful" discrimination.

But let us assume *arguendo* that Plaintiff's complaints to Marriott constituted protected activity. His retaliation claims still fail because no reasonable jury could conclude that *Marriott* engaged in conduct that was reasonably likely to deter Plaintiff from engaging in protected activity.

A plaintiff asserting a retaliation claim under the NYCHRL – which, again, imposes the most lenient standard – must show that "the *employer* engaged in conduct that was reasonably likely to deter a person from engaging in [an action opposing her employer's discrimination]." *See Mihalik*, 715 F.3d 102 at 112 (emphasis added). There is no evidence that Marriott did or

38

threatened to do anything that would have deterred a reasonable employee from complaining about anything. Plaintiff testified that he is still employed by Marriot as an A-List Banquet Waiter; he has not been suspended, written up, or otherwise disciplined since complaining about the rule changes or arbitration awards; and his pay has not been reduced. Pl. Tr. 223:1-12. When asked if any of his supervisors have discriminated against him or otherwise mistreated him, Plaintiff stated, "No, in fact, they support me." Pl. Tr. 83:8-11.

The only thing that Plaintiff deems retaliatory for his complaints is the hostile work environment he allegedly experienced due to derogatory comments made by Stamatis and two other Union delegates – none of whom had any supervisory authority over Plaintiff. *See* Pl. Tr. 104:6-18; 223:13-21. But as noted above, there is no evidence in the record to suggest that Marriott was aware of these comments and nonetheless failed to take action against the offending employees. As Plaintiff acknowledged at his deposition, he did not inform his employer about such conduct until he filed his complaint in this lawsuit. *See* Pl. Tr. 235:17-236:22. Therefore, it cannot be the basis for imposing liability on an unknowing employer – or for inferring that the employer retaliated against Naprstek for complaining about such activity.

After an "assiduous review" of the record, *see Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000), I find that no reasonable jury could conclude that Plaintiff's complaints about the arbitration outcomes constituted protected activity or that Marriott – the only defendant in this case – engaged in conduct that would be reasonably likely to deter a person from engaging in protected activity. Plaintiff has, therefore, failed to make out a prima facie case of retaliation, and Marriott is entitled to summary judgment dismissing Plaintiff's retaliation claims, whether asserted under the NYCHRL, NYSHRL, and Section 1981.

39

### VI.    PLAINTIFF CANNOT ASSERT A THEORY OF NEGLIGENT OR INTENTINAL INFLICTION OF EMOTIONAL DISTRESS FOR THE FIRST TIME ON SUMMARY JUDGMENT

For the first time in his summary judgment briefing, Plaintiff contends that he is entitled to summary judgment on a theory that he was subjected to either negligent or intentional infliction of emotional distress. *See* Dkt. No. 134 at 32. Marriott argues that the Court should not consider this argument because it does not appear in the pleadings and was improperly raised for the first time in Plaintiff's summary judgment briefing. *See* Dkt. No. 139 at 13-14. I agree.

As discussed above, "Even given the considerable leeway in pleadings afforded to *pro se* litigants, Plaintiff here cannot raise a new claim for the first time in a cross-motion for summary judgment." *Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 491 F. Supp. 2d 386, 402 (S.D.N.Y. 2007), *aff'd sub nom. Gadsden v. Bernstein Litowitz Berger & Grossman*, 323 F. App'x 59 (2d Cir. 2009). Because Plaintiff cannot raise a claim premised on this theory for the first time at the summary judgment stage, the Court need not consider his arguments on this point. *See Sturm v. Alpha Recovery Corp.*, 2021 WL 4311139, at *1 n.1 (E.D.N.Y. Sept. 22, 2021).

Were I to consider these claims, I would be forced to dismiss them as time-barred. Under New York law, claims of intentional infliction of emotional distress are governed by a one-year statute of limitations, while negligent infliction of emotional distress claims are subject to a three-year statute of limitations. *Chai v. New York Univ.*, 2024 WL 4042468, at *12 (S.D.N.Y. Sept. 4, 2024). The basis for Plaintiff's negligent and/or intentional infliction of emotional distress claim is something that took place in 2016. During that year, Plaintiff claims that he was falsely accused by a manager of stealing an iPhone charger, "thereby sullying Plaintiff's good name and reputation." Dkt. No. 134 at 32. Plaintiff argues that he "suffered extreme emotional distress over the allegation" before the manager withdrew the accusation of theft. *Id.* at 33. Any

such claim is untimely. Plaintiff did not commence this lawsuit until October 2021, more than five years after the 2016 incident which forms the basis for his claim and well after the statute of limitations expired – for the intentional tort in 2017 and for the negligent tort sometime in 2019.[14]

## Conclusion

For the foregoing reasons, Marriott's motion for summary judgment dismissing Plaintiff's discrimination and retaliation claims is GRANTED. Plaintiff's cross-motion for summary judgment is DENIED.

The Clerk of Court is directed to remove the motions at Docket Nos. 129, 134, and 132 from the Court's list of open motions and to close the case.

This is a written opinion. It resolves two motions for summary judgment.

Dated: July 2, 2026

_____
U.S.D.J.

BY ECF TO ALL COUNSEL
BY FIRST CLASS MAIL TO PLAINTIFF

---

[14] Because the statute expired prior to March 2020, the COVID extension does not apply. Plaintiff's emotional distress claims arising out of the phone charger incident were already time barred when Governor Cuomo extended the statute of limitations. Moreover, 2025 – which is when Plaintiff filed the papers in which he asserted this claim for the first time – is far too late to raise such a claim, even in light of the COVID toll.